## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

TOWN OF WAPPINGER, NY, ON BEHALF OF
ITSELF AND ALL OTHERS SIMILARLY
SITUATED,

                 Plaintiff,

                 **vs.**

VERIZON COMMUNICATIONS INC.,
VERIZON NEW YORK, INC., MCIMETRO
ACCESS TRANSMISSION SERVICES LLC,
MCI COMMUNICATIONS SERVICES LLC
dba VERIZON BUSINESS SERVICES,
METROPOLITAN FIBER SYSTEMS OF NEW
YORK, INC., XO COMMUNICATIONS
SERVICES, LLC; AT&T ENTERPRISES, LLC,
AT&T COMMUNICATIONS OF NEW YORK,
INC., SBC LONG DISTANCE, LLC, TC
SYSTEMS, INC.; FRONTIER TELEPHONE OF
ROCHESTER, INC., FRONTIER
COMMUNICATIONS OF SENECA-GORHAM,
INC., OGDEN TELEPHONE COMPANY,
FRONTIER COMMUNICATIONS OF SYLVAN
LAKE, INC., FRONTIER COMMUNICATIONS
OF AUSABLE VALLEY, INC., CITIZENS
TELECOMMUNICATIONS COMPANY OF
NEW YORK, INC., FRONTIER
COMMUNICATIONS OF AMERICA, INC.,
FRONTIER COMMUNICATIONS OF NEW
YORK, INC., FRONTIER
COMMUNICATIONS OF ROCHESTER, INC.;
CHAUTAUQUA & ERIE TELEPHONE
CORPORATION; TACONIC TELEPHONE
CORPORATION,

               Defendants.

Case No. 7:24-CV-09330-CS

## AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................2

JURISDICTION AND VENUE.............................................................................................5

PARTIES ..............................................................................................................................7

    A.    PLAINTIFF......................................................................................................7

    B.    VERIZON DEFENDANTS................................................................................7

    C.    AT&T DEFENDANTS ...................................................................................10

    D.    FRONTIER DEFENDANTS............................................................................12

    E.    CONSOLIDATED COMMUNICATIONS DEFENDANTS ..........................................15

FACTUAL ALLEGATIONS.................................................................................................17

    A.    DEFENDANTS ARE RESPONSIBLE FOR A SPRAWLING NEWORK OF LEAD-SHEATHED TELECOMMUNICATION CABLES............................................................17

    B.    DEFENDANTS' LEAD-SHEATHED CABLES ARE PRESENT IN THE TOWN OF WAPPINGER AND IN NEW YORK STATE. ....................................................................21

    C.    LEAD POSES SIGNIFICANT HEALTH RISKS.........................................................45

    D.    DEFENDANTS HAVE BEEN LONG AWARE OF THE RISKS POSED BY THEIR ABANDONED LEAD-SHEATHED CABLES BUT HAVE FAILED TO ACT TO MITIGATE OR ELIMINATE THOSE RISKS. .....................................................................................49

    E.    RECENT MEDIA ATTENTION HAS SPARKED GOVERNMENT INVESTIGATIONS INTO DEFENDANTS' LEAD-SHEATHED CABLES.........................................................54

    F.    DEFENDANTS HAVE REFUSED TO REMOVE THEIR ABANDONED LEAD-SHEATHED CABLES OR EVEN REVEAL THE CABLES' LOCATIONS, DESPITE ACKNOWLEDGING THAT THEY EXIST. .......................................................................58

    G.    PLAINTIFF HAS BEEN INJURED AND ENVIRONMENTAL REMEDIATION AND MEDICAL MONITORING IS REQUIRED. ......................................................................66

TOLLING / FRAUDULENT CONCEALMENT......................................................................68

SUCCESSOR LIABILITY....................................................................................................69

ALTER EGO LIABILITY.....................................................................................................70

CLASS ALLEGATIONS.......................................................................................................70

    COUNT 1: PUBLIC NUISANCE ........................................................................74

    COUNT 2: NEGLIGENCE .................................................................................75

    COUNT 3: TRESPASS ......................................................................................76

PRAYER FOR RELIEF.........................................................................................................77

JURY DEMAND...................................................................................................................79

Plaintiff TOWN OF WAPPINGER, NY ("Plaintiff"), on behalf of itself and all others similarly situated, by and through the undersigned counsel, hereby files this Amended Class Action Complaint, on behalf of itself and all others similarly situated, against Defendants, VERIZON COMMUNICATIONS INC., VERIZON NEW YORK, INC., MCIMETRO ACCESS TRANSMISSION SERVICES LLC, MCI COMMUNICATIONS SERVICES LLC dba VERIZON BUSINESS SERVICES, METROPOLITAN FIBER SYSTEMS OF NEW YORK, INC., XO COMMUNICATIONS SERVICES, LLC; AT&T ENTERPRISES, LLC, AT&T COMMUNICATIONS OF NEW YORK, INC., SBC LONG DISTANCE, LLC, TC SYSTEMS, INC.; FRONTIER TELEPHONE OF ROCHESTER, INC., FRONTIER COMMUNICATIONS OF SENECA-GORHAM, INC., OGDEN TELEPHONE COMPANY, FRONTIER COMMUNICATIONS OF SYLVAN LAKE, INC., FRONTIER COMMUNICATIONS OF AUSABLE VALLEY, INC., CITIZENS TELECOMMUNICATIONS COMPANY OF NEW YORK, INC., FRONTIER COMMUNICATIONS OF AMERICA, INC., FRONTIER COMMUNICATIONS OF NEW YORK, INC., FRONTIER COMMUNICATIONS OF ROCHESTER, INC.; CHAUTAUQUA & ERIE TELEPHONE CORPORATION; TACONIC TELEPHONE CORPORATION; and DOE DEFENDANTS 1-20, fictitious names whose present identifies are unknown (collectively "Defendants"), and alleges, upon information and belief, as follows:

1

## INTRODUCTION[1]

1.     This is a Class Action brought by Plaintiff the Town of Wappinger, New York, individually and on behalf of all other municipalities similarly situated (collectively, "Plaintiffs") against Defendants to remedy the negligence, trespass, and public nuisance created by the extensive network of toxic lead-sheathed telecommunications cables that Defendants have abandoned throughout New York State.

2.     Since before the 1960s, Defendants and their predecessors owned, operated, and managed telecommunications networks in New York. These networks include a sprawling grid of cables covered in lead—on poles overhead, in the soil, in buildings, and under water. Defendants' predecessors laid nearly all the cables in question, as they established telephone services across the United States.

3.     After the breakup of the Bell telephone system in the 1980s, Defendants took ownership and control of the cables in the locations in which they operated, including in New York. As technology advanced, Defendants turned to plastic sheathing and, later, fiber optics. When this happened, Defendants abandoned many of the old lead-sheathed cables in New York without any plan to maintain them or ensure that they did not pose a hazard to the environment in which they rested or the people who lived and worked nearby.

4.     As the lead in the old cables degrades, it leaches into the environment, contaminating soil, water, sediment, and air. For example, right now lead is leaching into the soil from one of Defendants' cables near the Town of Wappinger at levels above the Environmental Protection Agency's ("EPA") current lead threshold (*i.e.*, the amount above which the EPA would

---

[1] Plaintiff's allegations are based on personal knowledge, as to allegations focusing on the experience of Plaintiff, or on investigation by counsel based on publicly available information, as to all other allegations.

start risk assessment) of 100-200 parts per million.  On information and belief, similar leaching is happening from that same cable and others in the Town of Wappinger and in other municipalities in New York State.

5.      Individuals who encounter lead cables and the contaminated environment around them are at a heightened risk of lead exposure and poisoning.  Lead is on New York State's list of hazardous substances, 6 NYCRR Section 597.3, and lead exposure can cause significant health issues, including damage to the central nervous system, kidneys, cardiovascular system, reproductive system, as well as various forms of cancer and, in children, behavioral and learning difficulties.  Lead can cause health problems shortly after exposure.  It also can be stored in the body and released years later, causing health problems long after the initial exposure.

6.      Defendants have known for years that the lead-covered cables exist, that lead may be leaching into the environment surrounding the cables, and that lead poses critical health risks.  Defendants, however, have not meaningfully acted to mitigate the health risks, nor have they made adequate efforts to monitor, maintain, or dispose of the cables.

7.      Defendants' conduct in abandoning lead-sheathed cables throughout the state of New York constitutes negligence and trespass, and creates a public nuisance.  The lead-sheathed cables have contaminated and will continue to contaminate the environment and have endangered and will continue to endanger the safety, health, and wellbeing of the public in the communities governed by Plaintiffs.  Plaintiffs will bear the long-term costs of the contamination—costs that include expensive cable monitoring and remediation efforts, medical monitoring of residents, and health care costs for individuals who have been exposed and poisoned.

8.      Plaintiff seek relief on behalf of itself and the class in the form of: (1) injunctive relief, including an order directing Defendants to investigate, identify, and disclose the precise

location of each lead-sheathed telecommunications cable they have owned, operated, or managed in the State of New York, and to safely remove all such cables and remediate related lead contamination; (2) a court-mandated program or fund to assess and monitor the health of individuals living and working in affected communities and to provide access to appropriate screening and evaluation services; (3) damages in an amount to be determined at trial; and (4) attorneys' fees, costs of suit, and pre- and post-judgment interest.

## JURISDICTION AND VENUE

9.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act ("CAFA") because there is minimal diversity, a reasonable probability that the proposed class consists of at least 100 members, and the aggregated amount in controversy exceeds $5,000,000. *See* 28 U.S.C. § 1332(d)(2), (5)(B), (6).

10.     This Court has specific personal jurisdiction over Defendants under New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1), because each Defendant transacts substantial business within the State.

11.     Personal jurisdiction is also proper under C.P.L.R. § 302(a)(2) because each Defendant has committed tortious acts within the State.

12.     This Court has personal jurisdiction over Defendants by virtue of each Defendants' regular and systematic contacts with New York, including, among other things, purposefully installing, maintaining, servicing, owning and/or operating lead-sheathed cables in New York that they subsequently abandoned, and because they have the requisite minimum contacts with New York necessary to constitutionally permit the Court to exercise jurisdiction over them consistent with traditional notions of fair play and substantial justice.

13.     In addition and/or in the alternative, Defendants and/or their agents or alter egos each have significant contacts with New York because they own and operate telecommunications networks, including the lead-sheathed cables at issue, in New York, and have derived revenue from their operation of those networks in New York through the purposeful direction of their activities to New York and purposeful availment of the protections of the laws of New York, such that personal jurisdiction would be proper in New York under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District.  A substantial part of the events and omissions giving rise to the claims herein occurred in this District because Plaintiff is located in this District and Defendants installed, abandoned, and have refused to reveal the locations of lead-sheathed cables in and around Plaintiff.  28 U.S.C. § 1391(b)(2).  And because Plaintiff is located in this district, a substantial part of the property that is the subject of this action is situated in this District. *Id.*

6

## PARTIES

### A. PLAINTIFF

15.     Plaintiff the Town of Wappinger, New York, is a town organized under the laws of the State of New York and located within the Hudson River Valley National Heritage Area in Dutchess County.  It has a population of approximately 28,000 residents.

16.     Lead released from Defendant's infrastructure has contaminated the Town of Wappinger's soil, sediment, air, and water.  It has also placed citizens' health at risk.  This risk is ongoing and increasing.

17.     The Town of Wappinger provides a wide variety of services to citizens, including services related to public health, clean drinking water, maintenance of public lands, public assistance, and emergency care.  Plaintiff will bear the financial burden through these services of the harm caused by Defendants' abandoned lead-sheathed cables.  Absent action in this case, Plaintiff will bear the cost of, among other things, removing the lead cables or safely containing the lead contained in those cables; cleaning up contaminated soil, sediment, and water; and monitoring and treating citizens for the effects of lead exposure and poisoning caused by the lead leaching from Defendants' abandoned lead-sheathed cables.

### B. VERIZON DEFENDANTS

18.     The term "**Verizon Defendants**" refers collectively to Defendants Verizon Communications Inc., Verizon New York, Inc., MCIMetro Access Transmission Services LLC, MCI Communications Services LLC, Metropolitan Fiber Systems of New York, Inc. and XO Communications Services, LLC.

19.     At all times relevant to this action, the Verizon Defendants owned, operated, maintained and managed telecommunications networks in New York State and the communities

7

governed by Plaintiff and Class Members.  The infrastructure owned, operated, and managed by the Verizon Defendants includes a sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water.

20.    **Defendant Verizon Communications Inc. ("Verizon Communications")** is a Delaware corporation with headquarters in New York City, New York.  Acting through its subsidiaries, Verizon provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.  Upon information and belief, Verizon Communications owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

21.    **Defendant Verizon New York, Inc. ("Verizon New York")** is a New York corporation with its principal place of business in New York.  Verizon New York is a wholly owned subsidiary of Verizon Communications, and Verizon's principal operating subsidiary in New York. Verizon New York provides exchange telecommunication services and exchange access services, which includes local private line voice, data, and Centrex services, and linking transmission facilities to other telecommunication carriers.  Upon information and belief, Verizon New York owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

22.    **MCIMetro Access Transmission Services LLC ("MCIMetro Access")** is a Delaware limited liability company with its principal place of business in New Jersey.  MCIMetro Access is a wholly owned subsidiary of Verizon Communications.  MCIMetro Access provides telecommunications services, specializing in data and voice transmission, internet services, private lines, and virtual private networks (VPNs).  Upon information and belief, MCIMetro Access owns

8

and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

23.     **MCI Communications Services LLC dba Verizon Business Services ("MCI Communications")** is a Delaware limited liability company with its principal place of business in New Jersey. MCI is a wholly-owned subsidiary of MCI International LLC ("MCI International"), which is a limited liability company wholly owned by Verizon Business Network Services, LLC ("VBNS"). MCI Communications provides wired and wireless telecommunication services, long distance telephone communications, conferencing, and data and IP services. Upon information and belief, MCI Communications owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

24.     **Metropolitan Fiber Systems of New York, Inc. ("Metropolitan Fiber")** is a Delaware corporation with its principal place of business in New Jersey. Metropolitan Fiber is a wholly owned subsidiary of Verizon Communications. Metropolitan Fiber provides telecommunication services, fiber-optic network services, data, voice, and internet services. Upon information and belief, Metropolitan Fiber owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

25.     **XO Communications Services, LLC ("XO")** is a Delaware company with its principal place of business in New Jersey. XO is a wholly owned subsidiary of Verizon Communications. XO provides telecommunication solutions, managed IP, data, and end-to-end communication solutions. XO provides telecommunication services. XO focuses on local and long-distance voice, Internet access, virtual private networking, ethernet, webhosting, and integrated voice and data services. Upon information and belief, XO owns and manages lead-

9

sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

26.     The Verizon Defendants own, and improperly assessed and disposed of, the lead-sheathed telecommunications cables at issue in this Class Action Complaint.

## C.  AT&T DEFENDANTS[2]

27.     The term "**AT&T Defendants**" refers collectively to Defendants AT&T Enterprises, LLC, AT&T Communications of New York, Inc., SBC Long Distance, LLC and TC Systems, Inc.

28.     At all times relevant to this action, the AT&T Defendants owned, operated, maintained and managed telecommunications networks in New York State and the communities governed by Plaintiff and Class Members. The infrastructure owned, operated and managed by the AT&T Defendants includes a sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water.

29.     **Defendant AT&T Enterprises, LLC** is a Delaware limited liability company. Its sole member is AT&T Wireline Holdings, LLC, the sole member of which is AT&T DW Holdings, Inc., a New York corporation with its principal place of business in Texas.  Effective May 1, 2024, AT&T Corp. was converted into AT&T Enterprises, LLC.  AT&T Enterprises, LLC is thus the successor-in-interest to AT&T Corp.  Upon information and belief, AT&T Enterprises, LLC owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

---

[2] American Telephone & Telegraph Company ceased to exist in 1994, when it was renamed AT&T Corp. AT&T Corp. later merged with and into AT&T Enterprises, Inc., which was subsequently converted into Defendant AT&T Enterprises, LLC.

30. **Defendant AT&T Communications of New York, Inc. ("AT&T New York")** is a New York domestic business corporation with its principal place of business in New Jersey. AT&T New York is a wholly owned subsidiary of AT&T. AT&T New York provides intrastate telecommunication services, technology and entertainments products and services. Upon information and belief, AT&T New York owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

31. **Defendant SBC Long Distance, LLC d/b/a AT&T Long Distance ("AT&T Long Distance")** is a Delaware limited liability company with its principal place of business in New York. AT&T Long Distance is a wholly owned subsidiary of AT&T. AT&T Long Distance offers long distance calling card service and value card plus service, which allows customers to place intrastate, interstate and/or international calls. Upon information and belief, AT&T Long Distance owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

32. **Defendant TC Systems, Inc. ("TC")** is a Delaware corporation with its principal place of business in New Jersey. TC is a wholly owned subsidiary of AT&T. TC provides intrastate local private line services, telecommunication services, phone services, cabling solutions, network installation and maintenance, and traffic control system services. Upon information and belief, TC owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

33. Indeed, in publicly filed tariffs with the New York State Department of Public Service, AT&T identifies Dutchess County—which includes the Town of Wappinger—as a jurisdiction in which it imposes the Metropolitan Commuter Transportation District (MTA) tax surcharge. The MTA tax surcharge applies only to telecommunications services rendered in

11

covered areas.[3]  Additionally, AT&T's tariff filings state that it concurs in the exchange areas and exchange maps of legacy carriers such as NYNEX (now part of Verizon) and Citizens Telecommunications Company of New York Inc., both of which historically operated within Dutchess County.[4] These admissions confirm that AT&T offers local exchange service in the region and demonstrates that AT&T operates or maintains infrastructure—including legacy components such as lead-sheathed cables—within the Town of Wappinger.

34.    The AT&T Defendants own and improperly assessed and disposed of the lead-sheathed telecommunications cables at issue in this Class Action Complaint.

### D. FRONTIER DEFENDANTS

35.    The term "**Frontier Defendants**" refers collectively to Defendants Frontier Telephone of Rochester, Inc., Frontier Communications of Seneca-Gorham, Inc., Ogden Telephone Company, Frontier Communications of Sylvan Lake, Inc., Frontier Communications of AuSable Valley, Inc., Citizens Telecommunications Company of New York, Inc., Frontier Communications of America, Inc., Frontier Communications of New York, Inc., Frontier Communications of Rochester, Inc. and XO Communications Services, LLC.

36.    At all times relevant to this action, the Frontier Defendants owned, operated, maintained and managed telecommunications networks in New York State and the communities governed by Plaintiff and Class Members.  The infrastructure owned, operated and managed by

---

[3] *See*
https://ets.dps.ny.gov/ets_web/search/showPDF.cfm?M%3AIS%20%3B%2A%29LOUNWD%5CJ%5E8%2B%22%2B5%2F0MD%2F0%2A%22QZ%2FS%3CSXU2R%2AK%3AR%5CA%5B%2A2H%22N%5EAISF%20XNY%0A%27N7JEJK%5F%2CB%40%20%20%0A

[4] *See*
https://ets.dps.ny.gov/ets_web/search/showPDF.cfm?%3B%3AIS%20%3B%2A%29LOUNWD%5CJ%5E8%2B%22%2B5%2F0MD%2F0%2B%21QZ%29R%5C%3BX%0A

the Frontier Defendants includes a sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water.

37.    **Defendant Frontier Telephone of Rochester, Inc.** is a New York corporation with its principal place of business in New York.  Frontier Telephone of Rochester, Inc., provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.  Upon information and belief, Frontier Telephone of Rochester, Inc., owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

38.    **Defendant Frontier Communications of Seneca-Gorham, Inc.** is a New York corporation with its principal place of business in New York. Frontier Communications of Seneca-Gorham, Inc., provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.  Upon information and belief, Frontier Communications of Seneca-Gorham, Inc., owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

39.    **Defendant Ogden Telephone Company ("Ogden")** is a New York corporation with its principal place of business in New York.  Ogden provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.  Upon information and belief, Ogden owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

40.    **Defendant Frontier Communications of Sylvan Lake, Inc.** is a New York corporation with its principal place of business in New York.  Frontier Communications of Sylvan Lake, Inc., provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.  Upon information and belief, Frontier

13

Communications of Sylvan Lake, Inc., owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

41.    **Defendant Frontier Communications of AuSable Valley, Inc.** is a New York corporation with its principal place of business in New York. Frontier Communications of AuSable Valley, Inc., provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities. Upon information and belief, Frontier Communications of AuSable Valley, Inc., owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

42.    **Defendant Citizens Telecommunications Company of New York, Inc** is a New York corporation with its principal place of business in New York. Citizens Telecommunications Company of New York, Inc., provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities. Upon information and belief, Citizens Telecommunications Company of New York, Inc., owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

43.    **Defendant Frontier Communications of America, Inc.** is a Delaware corporation with its principal place of business in New York. Frontier Communications of America, Inc., provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities. Upon information and belief, Frontier Communications of America, Inc., owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

44.    **Defendant Frontier Communications of New York, Inc.** is a New York corporation with its principal place of business in New York. Frontier Communications of New

14

York, Inc., provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.  Upon information and belief, Frontier Communications of New York, Inc., owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

45.    **Defendant Frontier Communications of Rochester, Inc.** is a New York corporation with its principal place of business in New York. Frontier Communications of Rochester, Inc. provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.  Upon information and belief, Frontier Communications of Rochester, Inc. owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

46.    The Frontier Defendants own, and improperly assessed and disposed of, the lead-sheathed telecommunications cables at issue in this Class Action Complaint.

### E. CONSOLIDATED COMMUNICATIONS DEFENDANTS

47.    The term "**Consolidated Communications Defendants**" refers collectively to Defendants Chautauqua & Erie Telephone Corporation and  Taconic Telephone Corporation.

48.    At all times relevant to this action, the Consolidated Communications Defendants owned, operated, maintained and managed telecommunications networks in New York State and the communities governed by Plaintiff and Class Members.  The infrastructure owned, operated and managed by the Consolidated Communications Defendants includes a sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water.

49.    **Defendant Chautauqua & Erie Telephone Corporation and/or Consolidated Communications** is a New York corporation with its principal place of business in New York. Chautauqua & Erie Telephone Corporation and/or Consolidated Communications, provides

15

communications, technology, information and entertainment products and services to consumers, businesses, and government entities. Upon information and belief, Chautauqua & Erie Telephone Corporation and/or Consolidated Communications, owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

50.    **Defendant    Taconic    Telephone    Corporation    and/or    Consolidated Communications** is a New York corporation with its principal place of business in New York. Taconic Telephone Corporation and/or Consolidated Communications provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities. Upon information and belief, Taconic Telephone Corporation and/or Consolidated Communications owns and manages lead-sheathed cables in the Town of Wappinger and/or in an area nearby where run-off affects the Town of Wappinger.

51.    The Consolidated Communications Defendants own and improperly assessed and disposed of the lead-sheathed telecommunications cables at issue in this Class Action Complaint.

**FACTUAL ALLEGATIONS**

**A. DEFENDANTS ARE RESPONSIBLE FOR A SPRAWLING NEWORK OF LEAD-SHEATHED TELECOMMUNICATION CABLES.**

52.     Defendants own and are responsible for a sprawling network of telecommunications cables that are covered in a thick layer of toxic lead. This network stretches across New York, as well as other states in the United States. The lead-sheathed cables exist on poles overhead, in the soil, in buildings, and under water.

53.     These cables were installed decades ago. Beginning as early as 1888, telephone cables with lead sheathing were produced and widely used in the United States, long before the dangers of lead in the environment were understood. Defendants' predecessors laid nearly all the lead-sheathed cables in question prior to the 1960s as they built out telephone service across the United States.

54.     Eventually, telecommunications companies shifted from lead-sheathed cables to cables with plastic sheathing and paper insulators. Then, the industry transitioned to cables with polyethylene insulation.[5]

55.     In the 1970s, there was a movement to remove and replace lead-sheathed cables as part of routine upgrades and maintenance. Many smaller telecommunications companies slowly replaced these lead cables, but larger companies refused to upgrade or even maintain their lead-sheathed cables, electing instead to simply leave them in place.

56.     After the breakup of the Bell Telephone System in the 1980s, Defendants took ownership and control of the lead-sheathed cables in the locations in which they operated. When

---

[5]     *See* Copper Development Association, Inc., *The Evolution of Telephone Cable*, https://www.copper.org/applications/telecomm/consumer/evolution.html

technology advanced and Defendants turned to plastic sheathing and, later, fiber optics, they abandoned many of the old lead-sheathed cables. For example, large telecommunications companies such as Defendants AT&T and Frontier have chosen to upgrade to fiber systems and in doing so have left the old, dead lead-sheathed cables in place.

57.    The lead from Defendants' cables is not contained. It is seeping from the cables into the environment, including into air, water, soil, and sediment.

58.    On July 9, 2023, the *Wall Street Journal* ("*WSJ*") published an article titled "America is Wrapped in Miles of Toxic Lead Cables." The article reports what is claimed above: Telecom companies laid lead-sheathed cables across the nation decades ago, and thousands of the lead-sheathed cables remain and pose a massive, hidden health hazard.

59.    The *WSJ* highlighted the health risks posed by the roughly 2,000 lead-covered cables that remain in place from Bell Telephone System's old regional telephone network. The *WSJ* discovered a vast network of more than 1,750 underwater lead-covered cables and analyzed the country's five most populated states and over a dozen of its most populated counties to discover about 250 aerial lead-covered cables, often located next to schools and bus stops. These cables extend across approximately 66,000 miles nationwide.

60.    Of the thousands of lead-sheathed cable sites, *WSJ* reporters visited about 300. Hundreds of environmental samples were tested. Testing revealed that lead levels in the environment near Defendants' lead-sheathed cables exceed safety recommendations set by the EPA. Since January 2024, the EPA has recommended a "lead screening level" of 200 parts per million (ppm) in residential soil where children are likely to play. In areas with multiple sources of lead exposure—such as lead-based paint, drinking water pipes, telecom lead-sheathed cables or elevated ambient air levels—the EPA recommends a more protective screening level of 100 ppm.

These levels are intended to identify conditions that may pose a health risk and warrant further investigation or remediation.[6]  Researchers confirmed that the lead levels in the environment surrounding Defendants' lead-sheathed cables likely leached from the cables.

61.    According to the *WSJ*'s reporting, other telecommunications companies that, like Defendants, own portions of the old Bell system have also abandoned similar lead-sheathed cables in other locations around the country.  Independent testing of the environment surrounding those cables showed that, like the environment surrounding Defendants' cables, there were elevated levels of lead attributable to the telecommunications cables.

62.    Linda Birnbaum, a former EPA official and director of the National Institute of Environmental Health Sciences, told the *WSJ* that the findings "suggest there is a significant problem from these buried lead cables everywhere."  She further warned, "it's going to be everywhere, and you're not even going to know where it is in a lot of places."

63.    Lead exposure remains persistent in young children.  The *WSJ* reported that a Quest Diagnostics study from 2021 revealed that one in two American kids under six have detectable levels of lead in their blood.  Jack Caravanos, an environmental public-health professor at New York University who assisted with the *WSJ* investigation, stated that "[a] new, uncontrolled source of lead like old telephone cables may partly explain this phenomenon.  We never knew about it so we never acted on it, unlike lead in paint and pipes."

64.    On July 12, 2023, *Telecompetitor* published an article reporting that, "[i]f action is needed to remediate alleged dangers posed by old lead-encased copper telecom cabling, the cost

---

[6] *See* U.S. Envtl. Prot. Agency, *Memorandum: Updated Residential Soil Lead Guidance for CERCLA Sites and RCRA Corrective Action Facilities*, 2 (Jan. 17, 2024), https://www.epa.gov/system/files/documents/2024-01/olem-residential-lead-soil-guidance-2024_signed_508.pdf

could be in the range of $60 billion…."[7]   The estimate was based on research by *New Street Research* that found that approximately 44 million U.S. housing units may have lead exposure from lead-sheathed cables.

65.     The estimated remediation costs for incumbent local exchange carriers (ILEC) demonstrate the gravity of the situation, as demonstrated in the following graphics from New Street Research[8]:





---

[7] *See* Joan Engebretson, *Telecom Lead Remediation Cost Estimated at $60B; Could Impact BEAD Plans,* TELECOMPETITOR (July 12, 2023), https://www.telecompetitor.com/telecom-lead-remediation-cost-estimated-at-60b-could-impact-bead-plans/

[8] *Id.*

66.     Upon information and belief, Defendants have chosen to leave the lead-sheathed cables in place for economic reasons, despite knowing the risks to Plaintiff's land, natural resources, and residents as well as the same risks to other municipalities in New York State.

**B. DEFENDANTS' LEAD-SHEATHED CABLES ARE PRESENT IN THE TOWN OF WAPPINGER AND IN NEW YORK STATE.**

67.     In numerous cities and towns across New York State, including in the Town of Wappinger, Defendants' lead-covered telecom lines lie buried beneath streets and sidewalks, cross under nearby bodies of water, and hang overhead.

68.     In 2022, the *WSJ* contacted Marine Taxonomic Services, Ltd. ("MTS") to help investigate abandoned lead-sheathed cables in the United States.  The Environmental Defense Fund ("EDF") funded an initial study to conduct environmental sampling at locations adjacent to the cables.[9]

69.     New York State was chosen as a priority state based on the review of thousands of records, historical permits, NOAA navigational charts, and geographic indicators.  The locations for research identified in New York State include the Hudson River and the area including the Town of Wappinger, among others.

70.     The goal of the MTS research was to document the presence and condition of lead-sheathed cables.[10]  MTS and the *WSJ* first determined if cables were present at the locations in question and then visually assessed the composition of the cables.  Then, MTS collected samples of water, sediment, and soil in the immediate vicinity and tested the samples for lead.  The

---

[9]     *See* Marine Taxonomic Services, Ltd., *Lead Cable Investigation*, (June 30, 2023), https://www.edf.org/sites/default/files/2023-07/MTS_EDF%20Lead%20Cable%20Investigation_Final.pdf

[10] *Id.* at 51.

methodology was explained in detail in MTS's report entitled *"Lead Cable Investigation,"* dated June 30, 2023.[11]

71.    In January 2023, MTS and the *WSJ* investigated data points along the Hudson River, Harlem River, Wappingers Falls, and the Townships of New Windsor, Newburgh, Highland Falls, and the Palisades.  MTS screened twenty-three different site locations across the state of New York containing thirty-seven points of interest.  MTS found fourteen points of interest with *visible* lead-sheathed cables; those points were in Orange County (Highland Falls Township, New Windsor and Newburgh), Wappingers Falls (Dutchess County) and the Hudson River (Palisades Neighborhood in Rockland County).[12]

72.    Three of the points of interest with visible lead-sheathed cables were found in Wappingers Falls, which adjoins Plaintiff.  These three points were: (1) an overhead lead-sheathed cable near a grassy play area called Temple Park Playground; (2) a damaged lead-sheathed cable (out of service); and (3) a splice box at the base of a telephone pole.[13]  The three locations are pictured below:

---

[11] *Id.* at 2.

[12] *Id.* at 51-52.

[13] *Id.* at 58; *see also* Rick Karlin, *New York battles telecom firms over lead-sheathed lines*, TIMES UNION (January 21, 2024), https://www.timesunion.com/business/article/new-york-state-battles-telecom-firms-18613027.php






73.    The second and third points of interest (the damaged cable and splice box/telephone pole) are located on a sidewalk adjacent to Wappingers Creek and the historic Wappinger Lower Falls, close to the intersection between E Main Street and Market Street, at Coordinates 41.59868107721644, -73.919962022834.[14]

74.    The damaged cable and splice box/telephone pole are on a sidewalk adjacent to the creek and very close to a storm drain on Market Street, which is stenciled with the following warning: "DUMP NO WASTE, DRAINS TO WATERWAYS" as seen below:

---

[14] *See* https://maps.app.goo.gl/wzqh8TstrE3n5HkV8.





24



75.     This storm drain (marked in red circle) is adjacent to the Lower Falls of Wappinger

Creek, as seen below[15]:



---

[15] Original image obtained at https://nyfalls.com/waterfalls/wappingers-falls/ (last accessed on 5/20/2025).

76.     This damaged cable located near this storm drain has leached and will continue to

leach lead into the soil and waterways, including into Wappinger Creek.

77.     The Atlas Wellfield, a primary source of drinking water for the Town of Wappinger,

is located along Wappinger Creek.

78.     On July 13, 2023, in response to the *WSJ* article, staff from several New York State

agencies conducted soil sampling at Temple Playground and adjacent areas in Wappingers Falls.

[16] These sampling areas are in the portion of Wappingers Falls adjacent to the Town of Wappinger,

as seen in the below aerial photographs[17]:

---

[16] *See* New York State Department of Health (NYSDOH), Bureau of Toxic Substance Assessment, *Sampling Report for Lead in Soil at Temple Park Playground and Adjacent Areas, Dutchess Terrace and Market Street, Wappingers Falls, New York, July 27, 2023*, (2023), https://health.ny.gov/press/releases/2023/docs/wappingers_falls_report.pdf

[17] *Id.* at 5-6.





27

79.    Multiple X-Ray fluorescence (XRF) screenings, including with a Viken PB200i XRF, and 25 discrete soil samples were taken at these areas.

80.    The screenings showed multiple results of lead concentration exceeding 100 ppm, including as follows:

| Sample Number | Sample Location Description | Lead Concentration (ppm) | Notes |
|---|---|---|---|
| A1 | Market St. and Dutchess Ter. Intersection next to utility pole (under cable) | 288 | Directly under cable, outside playground |
| A3 | Market St. near second utility pole (under cable) | 111 | Directly under cable, outside playground |
| A4 | Market St. by park hours sign (under cable) | 137 | Directly under cable, outside playground |
| A6 | Market St. by children at play sign (under cable) | 113 | Directly under cable, outside playground |
| A7 | Market St. by pets must be leashed sign (under cable) | 410 | Directly under cable, outside playground |
| A8 | Market St. by third utility pole (under cable) | 180 | Directly under cable, outside playground |
| A9 | Market St. by fourth utility pole (under cable) | 161 | Directly under cable, outside playground |
| A10 | Market St. past fourth utility pole (under cable) | 189 | Directly under cable, outside playground |
| B4 | Five feet in from Market St. in line with children at play sign | 185 | 5 feet south of cable |

28

| B5 | Five feet in from Market St. in line with third utility pole | 224 | 5 feet south of cable |
| B6 | Five feet in from Market St. in line with fourth utility pole | 248 | 5 feet south of cable |
| C3 | Ten feet in from Market St. in line with pets must be leashed sign | 109 | 10 feet south of cable |
| C4 | Ten feet in from Market St. between third and fourth utility pole | 283 | 10 feet south of cable |
| G2 | Behind Industrial Park sign (under cable) | 302 | Cable comes to ground level at this location |
| G3 | Center of soccer field | 199 | Within Temple Park but considered background location |

81.    At the time, the NYSDOH determined that the results were within the then-applicable soil guidance values for children's play areas of 400 ppm, citing NYS Department of Environmental Conservation (2006, December 14). Division of Environmental Remediation. 6 NYCRR 375-6.8 and U.S. Environmental Protection Agency (2020, August), Lead in Soil.[18]

82.    On September 11, 2023, Verizon published an article stating that

> The findings of Verizon's investigation conducted at Wappingers Falls, New York are consistent with the New York State Department of Health's conclusion that soil lead levels near Verizon's cable in Temple Park are generally similar to lead levels in background samples and do not pose a public health risk. At each location tested at Wappingers Falls, the average soil lead level is lower than the residential soil lead threshold levels of 400 mg/kg set by the New York State Department of Environmental Conservation. And at three of the four sampling units nearest to the lead sheathed cable, the

---

[18] *Id.* at 7.

average lead concentration in soil is less than or equal to background
lead levels at that location. [19]

83.     But under the guidance issued by EPA in January 2024, which lowers the threshold
to 200 ppm or 100 ppm depending on the location (rather than 400 ppm), many of these results are
above screening levels, may pose a health risk, and warrant further investigation or remediation.

84.     Upon information and belief, the elevated lead concentration at this children's play
area in the Village of Wappingers Falls is caused by lead leaching from the Defendants' lead-
containing cables.

85.     Upon information and belief, just as Defendants' lead-sheathed cables are leaching
lead into the environment at this playground in the Village of Wappingers Falls adjacent to the
Town of Wappinger, they—including successive segments of those same cables—are leaching lead
into the environment in the Town of Wappinger.

86.     Upon information and belief, lead-containing cables run parallel north and south
along Wappinger Creek throughout the Village of Wappinger and the Town of Wappinger, as
depicted below:

---

[19] *See* Verizon, *Verizon reports lead test results, continues to work with EPA*, (September 11, 2023),
https://www.verizon.com/about/news/verizon-reports-lead-test-results-continues-work-epa



87.    The cables run southbound up to the location of BTSA's Sample A7 ("Market St. by pets must be leashed sign"), which had a lead concentration of 410 ppm.  A level of 410 ppm is higher than both the EPA's current (January 2024) and prior screening levels for lead concentration in the soil of residential areas.

88.    The cables above the location of Sample A7 are depicted below (Coordinates 41.5962418840064, -73.92537851503022):



31

89.     The lead-containing cables above the location of Sample A7 extend for miles in multiple directions, including towards Wappinger Creek, through the Town of Wappinger and towards Hughsonville, as depicted below:

a.  Continuation of Lead-Sheathed Cable – view towards Temple Park (Coordinates 41.59617104841403, -73.92572402880455):



b.  Continuation of Lead-Sheathed Cable – view towards Market Street, southbound (Coordinates 41.59617104841403, -73.92572402880455):



c. Continuation of Lead-Sheathed Cable – view towards Market Street, southbound (Coordinates 41.59611502462507, -73.92607532958702):



d. Continuation of Lead-Sheathed Cable – view from McKinley Street towards location identified by MTC, southbound (Coordinates 41.595898121330045, -73.92637403599356):



e. Continuation of Lead-Sheathed Cable – view from McKinley Street towards grassy area (Coordinates 41.595622413316335, -73.92626089869047):



f. Continuation of Lead-Sheathed Cable – view towards grassy area, southbound (Coordinates 41.59546149851388, -73.92619710594288):



g. Continuation of Lead-Sheathed Cable – view on Market Street towards Creek Road, southbound (41.59538143094409, -73.92615492446463):



h. Continuation of Lead-Sheathed Cable – view on Market Street towards Creek Road, southbound (41.59502003574003, -73.92603353588703):



i. Continuation of Lead-Sheathed Cable – view towards Creek Road, southbound and following Wappinger Creek (41.59456922592393, -73.926024016306016):



j. Continuation of Lead-Sheathed Cable – view towards Creek Road and Wappinger Creek, southbound (Coordinates 41.594285863238525, -73.9261032201692):



k. Continuation of Lead-Sheathed Cable – view towards Creek Road and Wappinger Creek, southbound (Coordinates 41.59382212370642, -73.92634095187341):



90.     These cables run continuously through the Town of Wappinger's residential areas in a sprawling network.  The lead-sheathed cables identified by MTS and the Bureau of Toxic Substance Assessment ("BTSA") of the NYS DOH on Market Street run through residential and commercial areas of the Village of Wappingers Falls and the Town of Wappinger (via Creek Road and U.S. Route 9).

91.     According to the effective Local Exchange Tariff submitted to the DPS,[20] the Verizon Defendants maintain multiple central offices and serve localities in the Mid-Hudson Region which are relevant to this litigation including, but not limited to:

a. Wappingers Falls, which also serves localities towards the south in Hughsonville and towards the west and across Wappinger Creek in New Hamburg.

---

[20] *See* Verizon New York, Inc.'s tariff submitted to DPS on 4/2/2014, Section "Local Exchange Tariff Outside of the New York Metropolitan Exchange Area", pages 10-38, https://ets.dps.ny.gov/ets_web/search/showPDF.cfm?M%3AIS%20%3B%2A%29LOUNWD%5CJ%5E8%2B%22%2B5%2F0MD%2F0%2A%22QN%2CQ%5C%3BZU2R%2AK%3AR%5CA%5B%2A2H%22N%5EAISF%20XNY%0A%27N7JEJK%5F%2CB%40%20%20%0A

b. Poughkeepsie, which also serves localities in Arlington, Red Oaks Mill – all located few miles north of Plaintiff's geographic location.

c. Marlboro, which is located west of Plaintiff's geographic location, across the Hudson River.

d. Beacon, which also serves localities in Chelsea (within the Town of Wappinger), Castle Point (adjacent to the Town of Wappinger), and Brinckerhoff, Brockway, Fishkill, Glenham and Wiccopee, all located south of Plaintiff's geographic location.

The Verizon Defendants maintain a sprawling network of lead-sheathed cables throughout these areas and others in the Mid-Hudson Region, including in the Town of Wappinger and in the other Class Members municipalities.

92.    A Verizon worker in Newburgh stated that "lead was a concern in the area, but that the company was understaffed and unable to address those concerns."

93.    Upon information and belief, the AT&T Defendants' lead-sheathed cables (including, but not limited to those in Dutchess County and others that run from Airmont to Chesterfield, MA, Airmont to Clarksville NY (72 miles, buried cable), and White Plains to Tully) run through the Town of Wappinger's geographic location and water sources, causing widespread contamination.

94.    Upon information and belief, the Frontier Defendants and Consolidated Communications Defendants are responsible for lead-sheathed cables that run through the Town of Wappinger's geographic location and water sources, causing widespread contamination.

95.    Due to the "visible lead sheathed submarine cables and an increasing number of observed, overhead, lead sheathed telecommunication cables[,] MTS recommend[ed] more

38

thorough investigation of all areas with overhead bare lead sheathed cables, to map locations and determine if there are health and safety risks that may be present for the residents."[21]

96.    In addition to soil and aerial contamination, Defendants' abandoned lead-sheathed cables have contributed to contamination of water resources.  Recent water testing confirms the ongoing risk of lead exposure in the community of Wappinger.

97.    The Town of Wappinger relies heavily on groundwater and surface water sources for its water supply.  Wappinger's public water supply derives from three major wellfields. As seen in the water source overview map below, the Atlas Wellfield, the most productive wellfield, is situated along Wappinger Creek. The other two wellfields, the Hilltop and Meadowwood Wellfields are situated along Sprout Creek.[22]

---

[21] *Id.* at 52.

[22] *See* Town of Wappinger, *Drinking Water Source Protection Program (DWSP2) Plan*, 3, 2.1 (January 2023), https://townofwappingerny.gov/wp-content/uploads/2024/01/DWSP2-Town-of-Wappinger_230126.pdf



98.    Exposure pathways for lead into municipal water supplies include leaching from infrastructure materials as well as environmental runoff from contaminated soils. Upon information and belief, Defendants' abandoned cables, many of which are submerged or buried near surface and groundwater resources, have contributed to lead contamination in Plaintiff's water sources and pose a serious ongoing risk of continued contamination.

99.    According to the United Wappinger Water Improvement District's *Annual Drinking Water Quality Report for 2023*, routine monitoring detected lead at measurable concentrations in water samples collected during 2022 and 2023.[23]    The report states that at least one sample collected from the distribution system contained lead levels of 5.85 ppb.  This level exceeds the 5 ppb threshold established under New York Public Health Law § 1110 for water in schools.

100.    Lead water contamination affects recreational activities, such as fishing and boating, and pose risks to aquatic life.  It also undermines the ecological integrity of the region and diminishes the quality of life for residents who rely on these waters for various uses.  Moreover, it necessitates ongoing monitoring and potential restrictions on water use, which can have economic implications for the community and require significant public resources to address.

101.    According to the EPA's How's My Waterway database, segments of Wappinger Creek and the adjacent Hudson River are classified as impaired for multiple designated uses, including recreation and aquatic life support. These impairments indicate that the water bodies do not meet applicable water quality standards, limiting their use for activities such as swimming, fishing, and supporting aquatic ecosystems. [24]

---

[23]  United Wappinger Water District, *Annual Drinking Water Quality Report for 2023*, 4 (2023), https://townofwappingerny.gov/wp-content/uploads/2024/05/AWQR-UWW-2023-final.pdf

[24]  *See* Environmental Protection Agency, *My Waterway: Wappinger Lake - Wappinger Creek: Identified Issues*, https://mywaterway.epa.gov/community/Wappinger/identified-issues

102.    Specifically, the EPA has identified contaminants such as mercury and benzo(a)pyrene—a polycyclic aromatic hydrocarbon (PAH)—in the sediment of Wappinger Creek at concentrations significantly above background levels.  These findings have led to the creek's inclusion on the Superfund National Priorities List, highlighting the severity of contamination and the need for remediation.  The Wappinger Creek Superfund site begins downstream of Wappingers Falls and extends about two miles downstream to where it merges with the Hudson River in the Town of Wappinger.  An industrial park that conducted many commercial activities for over 180 years is located on both the north and south banks of Wappinger Creek.  Results from a DEC investigation indicated that "creek sediments adjacent to and downstream of the industrial park are contaminated with several inorganic constituents, including mercury, lead, and chromium, as well as polycyclic aromatic hydrocarbons (PAHs), at concentrations above those detected in upstream samples."[25]

103.    Upon information and belief, telecommunications infrastructure—including lead-sheathed cables—was historically installed in and around the Market Street Industrial Park, which housed multiple heavy industrial operations during the era in which lead-sheathed cable was commonly used.  The industrial park is located in the Village of Wappingers Falls, adjacent to areas where such cables have been confirmed or are reasonably suspected to exist.  Defendants have failed to publicly identify or remediate any lead-sheathed telecommunications infrastructure in or around this site, raising substantial concerns about potential contribution to ongoing environmental risks in the area.

---

[25] Environmental Protection Agency, *Wappinger Creek – Wappingers Falls, Town of Wappinger, Town of Poughkeepsie,                        NY:                        Cleanup                        Activities*, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.cleanup&id=0201758&utm

104.     The Atlas Wellfield, a primary source of drinking water for the Town of Wappinger, is located along Wappinger Creek within the area that the EPA has classified as impaired under the Clean Water Act. Although the wellfield lies upstream of the Market Street Industrial Park, its location within an already burdened waterway heightens concern regarding potential cumulative impacts from additional sources, including abandoned lead-sheathed telecommunications cables. Contaminants may enter water systems through both surface and subsurface pathways, and the EPA's impairment designation reflects existing threats to the waterway's ability to support its designated uses. Given the wellfield's critical role in supplying potable water to the community, the presence or suspected presence of toxic legacy infrastructure in or near the impaired segment of Wappinger Creek necessitates ongoing environmental scrutiny, mitigation, and transparent disclosure by Defendants.

105.     The New York Department of Health's Heavy Metals Registry collects occupational blood levels for the entire state. In 2014, there was an average of 34.5 per 100,000 employed persons 16+ years of age in Dutchess County (where the Town of Wappinger is located) with elevated blood levels. These results were higher than the New York state rate of 23.4.[26]

106.     On March 11, 2024, Jack Caravanos and others published a research letter entitled *Measurement of Soil Lead Levels Adjacent to Lead-Sheathed Communications Cables*, exploring lead exposure from aerial terrestrial and submarine lead sheathed communications cables (LSCCs) and discussing the 209 XRF readings taken in suburban New York (and others in suburban New Jersey and rural Pennsylvania), which resulted in lead concentration in soil from areas immediately

---

[26] *See* Albany Medical Center PPS & Ellis PPS, *Capital Region, Mohawk and Hudson Valley DSRIP*: *Community Needs Assessment*, (2014), https://www.health.ny.gov/health_care/medicaid/redesign/dsrip/pps_applications/docs/albany_medical_center_hospital/3.8_albany_med_cna.pdf

below aerial cables that were "substantially higher" than background levels.[27]  The resulting

frequency distribution of lead was depicted as such:



107.    As discussed in the article,

> [a]n analysis of the lateral distribution of soil lead levels directly
> under the New York LSCC site was taken at the New York site. Eight
> of the 13 transect sites showed a clear decrease in soil Pb level
> within a few feet off the aerial cable centerline. The average drop-
> off in Pb levels was ~35%. This seems to confirm the primary
> contamination point was directly below the suspended cable.

The article concludes, as follows, with regards to childhood lead exposure:

> The main finding of this study was that lead from existing LSCCs
> can be transported from the cables and contaminate surrounding soil
> and dust. This contamination, in residential areas, has high potential
> to result in childhood lead exposure.  According to the US EPA's
> Integrated Exposure Update and Biokinetic Lead Exposure Model,
> children exposed to a residential level of ~325 ppm in soil would
> yield a blood lead level of 35 µg/L, equal to the current Centers for
> Disease Control and Prevention (CDC) reference level (3.5µg/dL).
> The US EPA has recently lowered its guideline regarding levels of
> lead in soil for residential properties from 400 to 200mg/kg (or
> ppm).[28]

---

[27] Jack Caravanos et al., *Measurement of Soil Lead Levels Adjacent to Lead-Sheathed Communications Cables*, EHP PUBLISHING (March 2024), https://ehp.niehs.nih.gov/doi/10.1289/EHP14086

[28] *Id.*

C.  **LEAD POSES SIGNIFICANT HEALTH RISKS.**

108.    The corrosion of aging lead-based infrastructure, including cables, poses a significant risk to human health, as toxic lead can leach into the environment, transfer to humans, and cause significant health issues.  Residents of the Town of Wappinger and of other affected municipalities are at high risk of lead exposure and the future onset of harmful lead-related conditions.

109.    Lead exposure can cause catastrophic health effects to humans, including damage to the central nervous system, brain, kidneys, and cardiovascular system.  Exposure can cause reduced kidney function, decreased blood hemoglobin, neuropathy, neurological problems, decreased cognitive function, and hearing and speech problems.

110.    Lead exposure can cause reproductive problems, including loss of sex drive, decreased fertility, infertility, reduced fetal growth, miscarriage, still birth, and premature birth. According to a recent study from health economists Daniel Grossman of West Virginia University and David Slusky of Kansas University, the fertility rate in Flint, Michigan, dropped precipitously in 2014 after the city switched the city water supply to water from the lead-poisoned Flint River. In pregnant women, lead can pass from mother to fetus, causing harmful health effects to the baby.

111.    Lead exposure can cause gastrointestinal symptoms, bowel changes, lung disease, muscle weakness, thyroid issues, cramps, hyperactivity, learning problems, changes in behavior or personality, headaches, vomiting, fatigue, irritability, mood changes, anemia, abdominal pain, muscle and joint pain, constipation, trouble sleeping, trouble concentrating, memory problems, and numbness in feet or legs.

112.    Lead is also classified as a probable human carcinogen by the International Agency for Research on Cancer (IARC).

113.    Lead is so harmful to humans that ingestion of lead can cause seizures, coma, and even death.[29]

114.    Lead's catastrophic effects are indisputable. According to the EPA and the World Health Organization ("WHO"), young children, infants, and fetuses are particularly vulnerable to lead. A dose of lead that would have little effect on an adult can have a significant effect on a child. Effects can include lower IQ, behavioral changes, and reduced educational attainment, along with anemia, hypertension, renal impairment, and toxicity to the reproductive organs. Sone of these effects are believed to be irreversible.

115.    Populations at higher risk for lead exposure include children from low-income households, children less than six years old, immigrant and refugee children from less developed countries, pregnant women, and adults working in industries that expose them to lead.[30]

116.    The WHO's 2021 update of the public health impact of chemicals estimates that nearly half of the two million lives lost to known chemicals exposure in 2019 were due to lead exposure. Lead exposure is estimated to account for 21.7 million years lost to disability and death (disability-adjusted life years) worldwide due to long-term effects on health, with 30% of the global burden of idiopathic intellectual disability, 4.6% of the global burden of cardiovascular disease and 3% of the global burden of chronic kidney diseases.

117.    There is no level of exposure to lead that is known to be without harmful effects, and there is no known safe blood concentration. The EPA, Food and Drug Administration ("FDA"), the WHO, the Centers for Disease Control and Prevention ("CDC"), and the American

---

[29] *See* U.S. Environmental Protection Agency, *Learn about Lead*, (February 7, 2024), https://www.epa.gov/lead/learn-about-lead.

[30] *See* , Mid-Hudson Region Local Health Departments, *Community Health Assessment*, 81 (2022-2024), https://www.montefiorenyack.org/sites/default/files/2022%20REGIONAL%20Community%20Health%20Needs%20Assessment.pdf.

Medical Association ("AMA") have all independently stated that there is no safe level of lead in a human body: (a) the EPA has stated that "the Maximum Containment Level Goal for lead is zero," which EPA set "based on the best available science which shows there is no safe level of exposure to lead"[31]; (b) the FDA has stated that "there is no known identified safe blood lead level"[32]; (c) the WHO has likewise stated that "[t]here is no known 'safe' blood lead concentration"[33]; (d) the CDC have found that "no safe blood lead level has been identified"[34]4; and (e) the AMA has stated that "we know that there is no safe level of lead."[35]

118.    Humans can be exposed to lead through occupational and environmental sources. For example, lead exposure can result from inhalation of lead particles or ingestion of lead-contaminated dust, water and food.

119.    The absorption and biological fate of lead, once it enters the human body, depends on a variety of factors.  The blood carries only a small fraction of total lead body burden, and serves as the initial receptacle of absorbed lead, distributing it throughout the body, making it available to other tissues.  Absorbed lead that is not excreted is exchanged primarily among three compartments: blood, mineralizing tissues (e.g., bones and teeth), and soft tissues (e.g., liver, kidneys, lungs, brain, spleen, muscles, and heart).

120.    Lead can stay in the blood for months and be stored in bones and teeth for decades. Individuals exposed to toxic lead may not develop lead-related conditions, or show lead-related

---

[31] EPA, Basic Information about Lead in Drinking Water, (August 13, 2020).

[32] Welch, Teresa, Lead Found in 20% of Baby Food, Report Says, (June 19, 2017).

[33] WHO, Lead Poisoning and Health, (August 23, 2019).

[34] CDC, National Biomonitoring Program, Factsheet, (July 12, 2013).

[35] AMA, AMA Adopts New Policies to Prevent Future Lead Poisoning, (June 14, 2016).

symptoms, until years after the lead exposure. Lead stored in bones and other mineralizing tissues can remain inert for many years and then be released back into circulation at a later date, damaging soft tissue and causing lead-related conditions at that time.

121.    Blood-lead-level is a widely used measure of exposure. Blood-lead-level tests, however, do not measure total body burden of lead and instead tend to be more reflective of recent or ongoing exposures.

122.    Mineralizing tissues (e.g., bones and teeth) carry the majority of total lead body burden in both adults and children. Lead in mineralizing tissues is not uniformly distributed. It tends to accumulate in bone regions undergoing the most active calcification at the time of exposure. Inert components of mineralizing tissues can store lead for decades. Under certain circumstances, previously inert lead will leave the bones and reenter the blood and soft tissue organs. Bone-to-blood lead mobilization can be unpredictable, but it increases during periods of advanced age, broken bones, chronic disease, hyperthyroidism, immobilization (e.g., bedridden), kidney disease, lactation, menopause, physiologic stress, and pregnancy (lead in bone is released into the blood during pregnancy and becomes a source of exposure to the developing fetus). Consequently, the normally inert pool of lead in the body poses a special risk because it is a potential endogenous source of lead that can maintain exposure to the toxic effects of lead long after exposure has ended.

123.    Sometimes individuals exposed to lead have no symptoms. Other times, symptoms caused by lead exposure will not appear right away. When symptoms do occur, they may develop over weeks or months and may flare up sporadically at irregular times.

124.    Symptoms or health effects can appear in the absence of significant current exposure because lead from past exposures can be stored in the body for decades. Thus, it is

important that individuals with historical lead exposure receive special medical monitoring to, among other things, evaluate whether the patient has potential lead poisoning, examine current or past lead exposures, look for other factors that affect the biokinetics of lead (such as poor nutrition, advanced age, broken bones, chromic disease, hyperthyroidism, immobilization (e.g., bedridden), kidney disease, lactation, menopause, physiologic stress, and pregnancy), and rule out lead poisoning as a cause of unexplained seizures or coma or any of the other conditions with which it is associated.

125.    The direct medical costs of lead exposure include treatment for acute lead poisoning—typically chelation therapy—as well as the treatment of long-term illnesses and complications that result from the initial lead exposure.

## D. DEFENDANTS HAVE BEEN LONG AWARE OF THE RISKS POSED BY THEIR ABANDONED LEAD-SHEATHED CABLES BUT HAVE FAILED TO ACT TO MITIGATE OR ELIMINATE THOSE RISKS.

126.    For decades, Defendants and their predecessors have known that the lead in their telecommunication networks was a possible health risk to individuals who worked on the cables, and that it could leach into the nearby environment, harming other people and property.

127.    In 1925, Alice Hamilton, a pioneer of modern industrial medicine and the first female faculty member at Harvard University, included telephone workers among those facing risks from lead in her book, *Industrial Poisons in the United States*.

128.    The old Bell system of phone companies had its own medical team who took blood tests for workers and kept detailed medical records. And studies from the 1970s and 1980s show that employees of the old Bell system who worked with lead cables regularly had high amounts of lead in their blood. For example, a 1977 Bell study provided a snapshot of high lead levels among

female lead-soldering workers.  Based on testing, Bell estimated that the workers had high blood-lead levels, in the range of 24 to 45 micrograms per deciliter.

129.    Blood tests in a similar time period also showed high lead levels in cable splicers, who fixed and maintained cables.  A 1978 letter between Communications Workers of America union officials said that Defendants' predecessors—affiliates of Bell and AT&T—have "confirmed that cable splicers may be exposed to a lead hazard," and that the company "is anxious to test splicers that may have been or are exposed to overdoses of lead."

130.    According to the *WSJ*, another worker who worked as a cable splicer for several Bell system companies for 45 years reported that company testing in the 1980s found that he had high levels of lead in his blood, but his manager told him to go back to working with lead shortly thereafter.

131.    Also according to the *WSJ*, a 2013 Minnesota OSHA investigation of another successor to the old Bell telephone system, CenturyLink, showed that a worker handling lead was exposed to airborne lead averaging 76 micrograms per cubic meter of air over eight hours, 52% above the regulator's limit.

132.    According to the *WSJ*, a cable splicer for AT&T reported working at least once a week with aerial or underground lead-sheathed cables, and thereafter had a kidney removed after a resurgence of cancer.  Similarly, a cable splicer for Southern Bell and Verizon now has chronic headaches, memory loss and difficulty breathing, his wife had two miscarriages, and his daughter suffered from childhood heart problems and has been diagnosed with ADHD, all of which can be linked to occupational lead exposure.  And multiple workers in the same family who were occupationally exposed to lead-sheathed telecommunications cables while working for AT&T all now have significant health issues that can be caused by lead exposure.

133.    AT&T has previously noted the risks from lead-sheathed cables dating to the old Bell system in its network.  Over the years, AT&T officials have expressed concern about the risks these cables present to workers.

134.    At a gathering of telecom officials in 2010, a senior AT&T manager cautioned the group about the danger posed by the cables.  "Some older metropolitan areas may still have over 50% lead cable," the slide said, adding that in some places they posed risks for phone-company workers and the surrounding environment. In the presentation, the manager acknowledged the environmental impact, saying that "soils retained between 83 and 98 percent of the released lead within 2 inches" from the cables.

135.    In a 2013 presentation, the same senior AT&T manager described how workers should be protected in the field, saying "POISON" signs needed to be placed visibly for technicians working with lead, and that workers handling the toxic metal should wear respirator masks and disposable Tyvek coveralls.

136.    Between 2007 and 2016, blood-lead test results for 208 Verizon workers showed that 85 of the workers (over 40%) had levels above 3.5 micrograms per deciliter, which is the current level at which the Centers for Disease Control and Prevention recommends seeking medical or environmental follow-up.

137.    According to the *WSJ*, one worker who retired from Verizon in 2021 after 40 years of working with lead said he raised concerns with managers about routinely pumping out water from manholes that were potentially contaminated with lead, including in front of schools. He said they told him, "If you don't feel safe, we'll send someone else."  The worker is quoted as saying: "When the manholes fill with rainwater and runoff, all the water we are pumping out is contaminated with lead dust."

138.    A 2022 Mount Sinai study of 20 Verizon workers found many had lead in their bones.  60% of workers had measurable lead in their shin bones.  45% of workers had lead at or above 10 micrograms per gram of bone, indicating increased risk of neurological or biological problems over time.  Only 5% of the workers had an elevated blood-lead level, demonstrating the inadequacy of relying on current blood-level testing to measure legacy lead exposure.

139.    Verizon has also been aware of *public* contact with lead-sheathed cables for years. In 2019, the DEP found that Verizon owned exposed lead-sheathed communications cables in ducts that run through manholes in multiple locations throughout the State, including a residential area in Little Haiti, Brooklyn, New York (40°38'28.8"N 73°56'36.0"W), as depicted below: [36]



---

[36] *See* Letter from DEP to Verizon Wireline Network Operations, (January 3, 2019), filed in *Jones, et al v Verizon New York, Inc., et al.,* Index No. 511568/2019, Doc. No. 32, https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=3shw/6N5vKgNlJ/zyuiHgA==

140.    Exposed lead-sheathed cables were found in the ground at this location – roughly 660 feet from a private high school and within 1,500 feet from three middle schools, a large playground and park – as depicted in the following photographs:



141.     The DEP found that Verizon's copper water service lines were deteriorated, likely caused by "stray DC currents from buried Verizon-owned lead-sheathed communications cable[s] in terracotta ducts located in the immediate vicinity of the deteriorated piping."  The stray current was being emitted by Verizon through abandoned traditional copper telephone wires that were no longer used by homeowners.[37]

142.     Notwithstanding their knowledge of the risks associated with their lead-sheathed cables, Defendants have not meaningfully acted to mitigate the health risks to the individuals who work, live and play near the cables.  They have not made adequate efforts to assess and dispose of the cables as required by New York law.  Nor have they made adequate efforts to warn people of the risk associated with the lead-sheathed cables.

### E. RECENT MEDIA ATTENTION HAS SPARKED GOVERNMENT INVESTIGATIONS INTO DEFENDANTS' LEAD-SHEATHED CABLES.

143.     The public was more recently made aware of the risks posed by Defendants' lead-sheathed cables.

144.     On July 9, 2023, the *WSJ* published the article mentioned above, titled "America is Wrapped in Miles of Toxic Lead Cables."

145.     On July 13, 2023, the *WSJ* released another article about the lead-sheathed cables and their dangers, titled "I Was Really Sick, and I Didn't Know From What."  This article discussed worker exposures to lead-sheathed cables.  The article exposed the scant precautions for individuals who work with the lead-sheathed cables.  It also noted studies in the 1970s and more

---

[37] *Id* at 1.

recently, in 2022, showing high lead content in the blood of individuals who worked on the cables.[38]

146.    On July 14, 2023, after these articles were released, JPMorgan downgraded AT&T shares due in part to concerns about potential business risks from the lead-sheathed cables.  It was estimated that AT&T's local exchange carrier business covers roughly 40% of the homes in the U.S. and maintains a significant presence via its long-haul network.[39]  The *WSJ* also estimated that it could cost $59 billion to remove the lead cables left behind by Defendants and other telecom companies.[40]

147.    On July 17, 2023, EDF published an article regarding its investigation with the *WSJ* and called on the EPA to seek further investigation.[41]

148.    On July 17, 2023, the shares in Defendants AT&T (NYSE: $T) and Frontier Communications (NASDAQ: $FYBR) were cut to neutral/high risk amid concerns regarding the fact that their copper networks may contain significant amounts of toxic lead sheathing.  AT&T's shares fell nearly 7% to hit their lowest level in 30 years.[42]

---

[38] *See* Shalini Ramachandran et al., *I Was Really Sick, and I Didn't Know From What*, WALL STREET JOURNAL (July 13, 2023), https://www.wsj.com/articles/lead-cables-exposure-workers-ca6d67f0

[39] *See* Chris Ciaccia, *AT&T stumbles as J.P. Morgan downgrades, citing worries over wireless, broadband,* SEEKING ALPHA (July 14, 2023), https://seekingalpha.com/news/3987632-att-slips-jp-morgan-downgrades-citing-worries-wireless-broadband

[40] *See* Thomas Gryta & Coulter Jones, *AT&T, Other Telecom Stocks Sink After WSJ Investigation on Toxic Lead Cables,* WALL STREET JOURNAL (July 14, 2023), https://www.wsj.com/articles/at-t-other-telecom-stocks-sink-in-wake-of-wsj-investigation-on-toxic-lead-cables-7f0f9293

[41] *See* Environmental Defense Fund, *Environmental Groups Call on U.S. EPA to Investigate Potential Harms of Lead Telecom Cables* (July 17, 2023), https://www.edf.org/media/environmental-groups-call-us-epa-investigate-potential-harms-lead-telecom-cables-0

[42] *See* Articles available at https://seekingalpha.com/news/3987939-citi-downgrades-att-frontier-telephone-and-data-systems-lead-cable-worries  and  https://www.reuters.com/business/media-telecom/att-shares-hit-three-decade-low-lead-cables-risks-weigh-2023-07-17/

149.    On July 18, 2023, AT&T admitted in public filings and internal emails that it maintained lead-sheathed cables.  It claimed that less than 10% of its two million miles of nationwide copper-wire telecom network had cables sheathed in lead.  AT&T further claimed that 2/3 of its lead-covered cables are "either buried or in conduit" followed by aerial cable, and a "very small portion" running under water.  It estimated that 25% of its cables are aerial, 63% of cables are buried in conduit, 7% percent are buried directly without the protection of conduit, and the remaining 5% percent are under water.  AT&T also announced a policy that will allow employees who may have been exposed to lead at work to take paid time off to be tested for lead levels.

150.    In response to the recent media reporting and buzz regarding the vast network of abandoned lead-sheathed cables, lawmakers have demanded that telecom firms act to ensure that Americans are safe.

151.    For example, the FCC chair, Jessica Rosenworcel, reached out to the EPA and White House Council of Environmental Quality to discuss her concerns about the cables.

152.    New York Governor Kathy Hochul directed the Department of Public Service ("DPS"), Department of Health, and Department of Environmental Conservation to immediately investigate the recent report of old lead-covered cables left by telecommunication companies and the potential public health risks associated with exposure to those cables.[43]

153.    United States Senator Edward Markey wrote a letter to USTelecom, the industry group representing telecom companies, including Defendants, stating that, "This is corporate irresponsibility of the worst kind," [t]he telecommunications companies responsible for these phone lines must act swiftly and responsibly to ensure the mitigation of any environmental and

---

[43] *See* State of New York, *Governor Hochul Directs State Agencies to Investigate Old Lead-Covered Cables Left in Communities by Telecommunication Companies*, (July 20, 2023), https://www.governor.ny.gov/news/governor-hochul-directs-state-agencies-investigate-old-lead-covered-cables-left-communities

public health effects, and "[t]he members of USTelecom that are responsible for these lead-sheathed cables have a duty—both civic and legal—to ensure that they do not put Americans in harm's way."

154.    Former Ulster County Executive and current United States Representative Pat Ryan of New York also wrote to the CEOs of Verizon and AT&T, as well as USTelecom, and demanded that they remove lead cables from New York's Hudson Valley and across the United States.[44] Congressman Ryan specifically demanded that Defendants explain their plans to address the environmental and public health issues posed by abandoned lead-sheathed cables, and their plans for remediation and removal of all lead-sheathed cables, particularly near the Wappingers Falls playground.[45] These questions have never been properly addressed by Defendants, either in response to the Congressman's letter or in subsequent meetings.[46] Congressman Ryan assembled a team of lead experts to locate lead cables in Hudson Valley, finding such cables in Middletown, New Windsor, and Poughkeepsie.

155.    United States Representative Frank Pallone, Jr., a ranking member of the House Energy and Commerce committee, said: "There is no safe level of lead exposure—none—which is why I'm so disturbed by these reports of lead cable lines throughout the country," and "[i]t is imperative that these cables be properly scrutinized and addressed."

---

[44] *See* Rep. Patrick Ryan, *Press Release: Congressman Pat Ryan Demands Verizon and AT&T Clean Up Their Mess, Remove Lead Cables from Hudson Valley and across United States*, (July 20, 2023), https://patryan.house.gov/media/press-releases/congressman-pat-ryan-demands-verizon-and-att-clean-their-mess-remove-lead

[45] *Id*.

[46] *See* USTelecom-The Broadband Association, *Letter in response to Congressman Pat Ryan*, (July 26, 2023), https://patryan.house.gov/sites/evo-subsites/patryan.house.gov/files/evo-media-document/2023.07.26-ust-response-to-rep-ryan-final.pdf

156.    On July 28, 2023, nonprofit organization Brookings published an article in which it concluded that millions of Americans could be affected by thousands of miles of toxic lead-sheathed telephone cables. [47]  Brookings urged mapping all installations to prioritize remediation based on proximity to vulnerable areas such as schools, playgrounds, and hospitals.

157.    The New York State Department of Public Service ("DPS") initiated an investigation, "In the Matter of the Investigation of Lead-Covered Cables and the Potential Associated Health Risks," 23-01574.[48]  DPS requested that 246 telecom firms and smaller local phone companies provide maps, lists, and any other information to identify the location of lead-sheathed cables in the state.

## F.  DEFENDANTS HAVE REFUSED TO REMOVE THEIR ABANDONED LEAD-SHEATHED CABLES OR EVEN REVEAL THE CABLES' LOCATIONS, DESPITE ACKNOWLEDGING THAT THEY EXIST.

158.    In response to DPS's investigation, Defendants acknowledged that the lead-sheathed cables existed, but minimized the issue.

159.    For example, Verizon's CEO stated that "lead infrastructure makes up a small percentage of our copper network, and we began phasing away from installing new lead cable by the 1950s."[49]  He stated that "records are incomplete as to exactly how much" copper cable has lead sheathing.  He claimed that Verizon was still "reviewing the historical records" of some

---

[47] *See* Tom Wheeler & Blair Levin, *Toxic lead telephone lines: Searching for solutions,* BROOKINGS (July 28, 2023), https://www.brookings.edu/articles/toxic-lead-telephone-lines-searching-for-solutions/

[48] *See* Department of Public Service, *In the Matter of the Investigation of Lead-Covered Cables and the Potential Associated Health Risks*, (2023) (Matter number: 23-01574), https://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=23-01547&CaseSearch=Search

[49] *See* Joe Panettieri, *Verizon Lead Cables FAQ: CEO, CFO Statements About Telecom Network,* SUSTAINABLE TECH PARTNER NEWS (July 26, 2023), https://sustainabletechpartner.com/news/verizon-lead-cables-faq-ceo-cfo-statements-about-telecom-network/.

network cables owned by MCI and XO Communications to determine whether they contained lead. [50] He refused to discuss "specifics around employees" that may have suffered lead poisoning, or to acknowledge the likelihood that the public was exposed to the lead-sheathed cables.[51] Verizon's CFO acknowledged that the potential for public contact was a real issue. [52]

160.    AT&T CEO John Stankey also attempted to downplay the risks, arguing that lead-clad cables have long been part of American infrastructure and that longstanding science gives no reason to believe these cables pose a public health risk.[53]

161.    Similarly, Frontier CEO Nick Jeffery refused to acknowledge the damage that lead cables have caused in New York State, indicating that Frontier has "no reason to believe that lead in Frontier cable has called [sic] any health or environmental harm." [54]

162.    In response to the DPS investigation, Defendants took the following positions:

    a.  The Verizon Defendants acknowledged that they own lead-containing cables that have been abandoned in New York.[55]  However, they alleged that the specific information requested in the DPS investigation constitutes trade secrets, confidential commercial information and/or critical infrastructure information that

---

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *See* Joe Panettieri, *AT&T Lead-Clad Cables FAQ: CEO John Stankey Statements About Telecom Network,* SUSTAINABLE TECH PARTNER NEWS (July 26, 2023)*,* https://sustainabletechpartner.com/news/att-lead-clad-cables-faq-ceo-john-stankey-statements-about-telecom-network/

[54] *See* Joe Panettieri, *Lead Cables in Telecom Networks: Frontier Communications' CEO Statement*, SUSTAINABLLE TECH PARTNER NEWS (August 10, 2023), https://sustainabletechpartner.com/vertical-market/telecom-services-sustainability/lead-cables-in-telecom-networks-frontier-communications-ceo-statement/

[55] *See* Verizon, *Verizon reports lead test results, continues to work with EPA*, (September 13, 2023), https://www.verizon.com/about/news/verizon-reports-lead-test-results-continues-work-epa

is exempt from disclosure under the Freedom of Information Law.[56]  According to

the New York State Public Service Commission, Verizon submitted "Exhibit A,"

which consists of a spreadsheet that "is the best inventory of Verizon New York's

copper network available at this time."[57]  This document is not available to the

public and purportedly:

> categorizes Verizon's network records at the local switching center
> ("wire center") level. [] For records with latitude and longitude data,
> Exhibit A provides a town-by-town accounting of cables that contain
> lead sheathing or remain under investigation. *Id*. For records that do
> not contain latitude and longitude data, Verizon could not provide
> the more precise town-by-town inventory. *Id*. Exhibit A reports the
> mileage of lead-sheathed and non-lead sheathed cables within the
> different wire centers in the state. For each wire center, Exhibit A
> categorizes the cables into three groups, cable that is: "(i) known to
> be lead-sheathed, (ii) known not to be lead-sheathed, and (iii) under
> review and thus unknown with respect to lead sheathing at this
> time." Id. Verizon further categorizes the cables as "aerial,"
> "building," "buried," "submarine," and "underground cable." *Id*.

---

[56] Verizon has previously disclosed the *retirement* of copper wires in a multitude of locations in New York, including in Suffolk County (Brookhaven) in April of 2024, Counties of Schoharie (Cobleskill), Washington (Cambridge), Oneida (Camden), Cortland (Cortland), St. Lawrence (Gouverneur), Rensselaer (Hoosick Falls), Schenectady (Mariaville), Cayuga (Moravia), Clinton (Plattsburgh) and Oneida (Rome) in February of 2023; Counties of Montgomery (Amsterdam), Jefferson (Alexandria Bay), Schoharie (Cobleskill), Oswego (Cleveland), Clinton County (Dannemora, Peru, Plattsburgh), Herkimer (Dolgeville, Herkimer, Little Falls), Jefferson (Clayton, Evans Mills, Lafargeville, Philadelphia, Theresa, Watertown), Madison (Canastota, Oneida), Oneida (Rome), Rensselaer (Hoosick Falls, Valley Falls), St. Lawrence (Gouverneur, Heuvelton, Morristown, Ogdensburg), Schenectady (Delanson), Schoharie (Central Bridge, Esperance), Washington (Cambridge, Greenwich, Salem), Cortland (Cortland, Groton, Homer, McGraw), Tompkins (Lansing, Mclean, Poplar Ridge, Union Springs), Cayuga (Moravia) and Schenectady (Mariaville) in October of 2022; and the Counties of New York (Queens, Brooklyn, Astoria, Bronx, Corona, Flushing, Forest Hills, Long Island City, Newtown, Richmond Hill), Richmond (Staten Island), Erie (Williamsville), Nassau (Mineola), and Westchester (Mount Vernon) in February of 2017. As stated under the FCC's Rule 51.333, "retirement" does not necessarily mean *removal* pursuant to 47 CFR 51.325(a)(3), but may include disabling, retirement in place or abandonment. *See* Verizon, *Public Notice of Copper Retirement under Rule 51.333*, (April 25, 2024), https://www.verizon.com/about/sites/default/files/2024-04-25-Verizon-Selden-Shoreham-NY-Copper-Retirement-Notice-2024-02-A-NY.pdf (April 25, 2024); Verizon, *Public Notice of Copper Retirement under Rule 51.333*, (February 13, 2023), https://www.verizon.com/about/sites/default/files/2023-02-21-Verizon-NY-Copper-Retirement-Notice-2023-01-A-NY.pdf, *Exhibit A: Verizon Copper Retirement 2023-01-A-NY*, https://www.verizon.com/about/sites/default/files/2023-02-21-Verizon-NY-Copper-Retirement-Notice-Exhibit-A-2023-01-A-NY.pdf; Verizon, *Public Notice of Copper Retirement under Rule 51.332*, (February 28, 2017) https://www.verizon.com/about/sites/default/files/2-28-17CopperRetIDNo2017-01-B-NY.pdf

[57] *See* Opening Brief of Appellant New York State Public Service Commission, *Verizon New York, Inc. et al. v NYSPSC,* CV-24-0245 (Third Judicial Department), located at https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=k_PLUS_QotyCHdw06JHALy1nc0A==

> Verizon explains that Exhibit A was created over a two-month period by many different people working with Verizon's engineering data systems. [] Exhibit A provides no indication of whether the cables are currently in use, and Verizon's submissions indicate that only some of the legacy lead-sheathed copper cables remain in active service.

There are no publicly available documents that identify the location of these cables, as Verizon has chosen to redact their submissions to the DPS and litigate frivolously to preclude all public efforts to obtain this information.[58]

b.  The AT&T Defendants admitted that approximately 690 miles of lead cable remain in place in their networks.  AT&T owns two facilities that contain lead and continues to actively use those facilities to operate their fiber optic long-distance network.  AT&T also identified two long-distance network facilities in White Plains and Tully, New York that are associated with its lead-containing long distance network; two central office locations in Albany and Buffalo, New York, where AT&T is now a tenant; and three central office locations in Airmont, Attica, and Clarksville, New York, sold by AT&T to private entities where "cable ends [were] properly cut off and capped."  AT&T also identified cable segments that contain lead in locations from Airmont to Manhattan (1.44 miles), Airmont to Chesterfield, MA (77.93 miles), Airmont to Clarksville (72.1 miles), Clarksville to Chesterfield (32.69 miles), Clarksville to Albany (8.99 miles), Clarksville to Tully (121.39 miles), Tully to Syracuse (9.61 miles), Tully to Attica (102.26 miles), Attica to Buffalo (31.07 miles), Attica to Waterford, PA (131.29 miles), Buffalo to Erie, PA (70.69 miles), Ausable Chasm to Port Kent (3.18 miles), Morrison to Fishkill (18.88

---

[58] *See Verizon New York, Inc. et al. v NYSPSC,* CV-24-0245.

miles), and White Plains to Port Chester (7.45 miles). Notwithstanding, the AT&T Defendants have not provided sufficient specificity as to the locations of lead-sheathed cables in the state that would allow testing to determine the extent of the contamination in their corresponding geographic locations.

c.  The Frontier Defendants also have publicly acknowledged, through CEO Nick Jeffery, that some of the 685,000 miles of metallic cabling of its network includes lead cables ("[l]ead cables represent a single-digit percentage of Frontier Communications' roughly 685,000 total miles of metallic cabling in its network…").[59]  According to publicly available information submitted by Frontier to the DPS, Frontier Communications of America, Inc., provided business network switched services in Newburg, Poughkeepsie, New Paltz, Monticello, Cornwall, Hyde Park, Wappingers Falls, Kingston, Beacon, New Windsor and North Clove.[60] However, Frontier refused to provide specifics, including the number of miles for lead-sheathed or non-lead-sheathed cables they owned or abandoned in New York. The Frontier Defendants have not provided sufficient specificity as to the locations of lead-sheathed cables in the state, which would allow Plaintiff and Class Members to conduct testing to determine the extent of the contamination in their corresponding geographic locations.

---

[59] *See* Joe Panettieri, *Lead Cables in Telecom Networks: Frontier Communications' CEO Statement*, SUSTAINABLLE TECH PARTNER NEWS (August 10, 2023), https://sustainabletechpartner.com/vertical-market/telecom-services-sustainability/lead-cables-in-telecom-networks-frontier-communications-ceo-statement/

[60] *See* Section A 1 of Frontier Communications of America, Inc.'s "Business Network Switched Services", submitted to DPS on 11/30/2020, https://ets.dps.ny.gov/ets_web/search/showPDF.cfm?M%3AIS%20%3B%2A%29LOUNWD%5CJ%5E8%2B%22%2B5%2F0MD%2F0%28%23AF%26R%3CCVU2R%2AK%3AR%5CA%5B%2A2H%22N%5EAISF%20XNY%0A%27N7JEJK%5F%2CB%40%20%20%0A

    d.   The Consolidated Communications Defendants admitted that they own aerial lead-containing cables above land in sixteen locations that are "[n]ot in service, but not yet removed." These locations include an estimated 18,778 feet of cable in the municipalities of Portland, Pomfret, and Westfield (Defendant Chautauqua and Erie Telephone Corporation) and 31,140 feet of cable in the municipalities of Berlin, Austerlitz, Spencertown, Nassau, Schodack, North East, Chatham and Pine Plains (Defendant Taconic Telephone Corporation). Notably, according to the coordinates submitted to the DPS (from 41.97582 -73.655835 to 41.97558 -73.657099), Consolidated maintained an aerial lead cable "[n]ot in service, but not yet removed" in Pine Plains, within 1 km from three bodies of water: Twin Island Lake, Stissing Pond and Thompson Pond. Thompson Pond is the source of Wappinger Creek and the Atlas wellfield – one of the United Wappinger Water District's drinking water sources. Upon information and belief, this lead-sheathed cable was located in an area nearby where run-off affected the Town of Wappinger. The Consolidated Communications Defendants effectively abandoned these lead-sheathed cables.

163.    Verizon has continued to fight to keep the location of their toxic lead-sheathed cables private. In November of 2023, Verizon commenced a CPLR Article 78 petition to prevent disclosure of the locations of lead-sheathed cables within the state of New York, in light of the Wall Street Journal's FOIL request for disclosure.

164.    On March 14, 2024, the United States Securities and Exchange Commission ("SEC") sent a letter to Verizon regarding the Association of BellTel Retirees Inc.'s proposal for the telecom company to

                undertake a comprehensive independent study and publicly release an independent report that demonstrates the Company has assessed

63

> all potential sources of liability related to lead-sheathed cables,
> including a comprehensive mapping of the locations impacted and
> conclusions on the potential cost of remediation, along with the most
> responsible and cost-effective way to prioritize the remediation of
> sites that pose a risk to public health.[61]

Verizon sought to exclude this proposal from its proxy materials for the upcoming annual meeting

of security holders, in order to avoid disclosing a full inventory and location of lead-containing

aerial and buried cables.

165.    In March of 2024, Congressman Ryan brought together local elected officials,

environmental advocates, and concerned community members to address the growing threat of

toxic lead-sheathed cables abandoned throughout the Hudson Valley.  After discovering several

hundred feet of abandoned cables in Orange County (Cornwall, Middletown and New Windsor),

along with additional lead-sheathed cables in Ulster County (City of Kingston[62])  and Dutchess

County (City of Poughkeepsie and Town of Wappinger), the group called on Verizon and AT&T

to publicly disclose the locations of all such hazardous cables in New York.

166.    Defendant Verizon has stated that it was "taking the[] concerns regarding lead-

sheathed cables very seriously," adding that "there are many lead-sheathed cables in our network

(and elsewhere in the industry) that are still used in providing critical voice and data services,

including access to 911 and other alarms, to customers nationwide."[63]

---

[61] Securities and Exchange Commission, *Re: Verizon Communications Inc. (the "Company") incoming letter dated January 5, 2024*, 1 (March 14, 2024), https://www.sec.gov/files/corpfin/no-action/14a-8/belltelverizon031424-14a8.pdf

[62] Upon information and belief, abandoned lead-sheathed cables have been identified on the ground on the rail trail from Kingston to Route 209 South. The trail is near the Hudson River and other surface water sources.

[63] *See* Maggie Harrison Dupré, *Old Phone Cables Appear to Be Contaminating US Soil and Water with Lead*, FUTURISM (July 11, 2023), https://futurism.com/phone-cables-soil-water-lead

167.    On April 29, 2025, during oral argument before the Third Judicial Department in

the matter of *Verizon New York, Inc. et al. v NYSPSC,* CV-24-0245, Verizon continued to argue

against the disclosure of (1) the general cable environment involved (aerial, underground [in

conduit], buried [not in conduit], submarine [under water], and buildings); (2) by whether the cable

in question was or was not lead-sheathed or remained under investigation; and (3) the total mileage

and percent of mileage within each wire center containing lead-sheathed cables, among other

information necessary to locate the lead-sheathed cables in the state.  Verizon was vehemently

opposed to an entity seeking disclosure of the information "simply by asking for it."[64]

168.    The panel of justices questioned Verizon's arguments as to purported trade secrets

and competitive harm, including the following highly relevant exchange:

| The Court: | Well, regarding—what are you worried about? The percentage of the wires that are buried and are lead-clad? |
|---|---|
| Verizon: | Buried, people can say that it's in the ground; it's going to make you sick; if it's under the water it's going to get into your drinking water; if it's in the air— |
| The Court: | Is that true? |
| Verizon: | Is it—I think it doesn't matter if it's true. |
| The Court: | Well, no. If a competitor were to make that claim that 'look. Verizon here uses a high percentage of lead-clad cable and has it buried underground. And that's dangerous.' That's what they would say? |
| Verizon: | That is one of the things they would say, yes. |
| The Court: | And would that be true? |

---

[64] This statement was made and discussed during the oral argument held on April 29, 2025, in *Verizon New York, Inc. et al. v NYSPSC,* CV-24-0245, a video recording of which was made publicly available at https://cmi.nycourts.gov/vod/CourtSession/ad3/CV-24-0245.

| | |
|---|---|
| Verizon: | Uh, I am not a scientist, Your Honor. |
| The Court: | What's Verizon's position on this? |
| Verizon: | Verizon's position is that it keeps the lead-sheathed cable as safe as it possibly can. And it does with it what it can. It has to play the hand it dealt. But this is not an issue of public… um, a public health issue, it's just an issue of what, we think, what our competitors are going to use this information.[65] |

169.    Verizon has acknowledged that it maintains at least 8,400 miles of lead-sheathed cables but continue to argue against disclosure under FOIL based on potential competitive harm, as its competitors may insinuate that their network may harm the public or is outdated.

170.    After three years of litigation, on September 18, 2024, the defendant Pacific Bell Telephone Company (now AT&T) agreed to settle the matter of *California Sportfishing Protection Alliance v Pacific Bell Telephone Company,* 21-00073-JDP (E.D. California), by removing 8 miles of lead-containing telecommunications cables in Lake Tahoe, California, which contain over 120,000 pounds of lead conduit/sheathing.  However, said Defendant has refused to admit that the cables pose any risk to human health or the environment.

171.    All Defendants are aware of the existence of the lead-sheathed cables and the risks they carry, as evidenced by their public statements and refusals to cooperate with the DPS's investigation and other investigations.

### G. PLAINTIFF HAS BEEN INJURED AND ENVIRONMENTAL REMEDIATION AND MEDICAL MONITORING IS REQUIRED.

172.    The injuries to Plaintiff include, but are not limited to:

---

[65] This transcript was prepared by Counsel for Plaintiff from the publicly available video recording of the hearing held on April 29, 2025, in *Verizon New York, Inc. et al. v NYSPSC,* CV-24-0245, located at https://cmi.nycourts.gov/vod/CourtSession/ad3/CV-24-0245.

a. Soil Contamination: Lead leaching into the soil causes significant contamination within Plaintiff's borders.  This contamination places Plaintiff's residents at risk, decreases the value of both public and private properties, causes Plaintiff to lose tourism and recreation revenue, and affects road construction, maintenance, and other public works.  Defendants should be compelled to remediate the soil contamination caused by their cables.

b. Water Contamination: Lead seeping into water bodies (lakes, rivers, groundwater) causes public health hazards within Plaintiff's borders.  This contamination places Plaintiff's residents at risk, decreases the value of both public and private properties, causes Plaintiff to lose tourism and recreation revenue, and affects water supplies, including by requiring major upgrades to water infrastructure, such as filtration systems to remove lead.  Defendants should be compelled to remediate the water contamination caused by their cables, including through water treatment and environmental restoration.

c. Air Contamination (from aerial lines): Lead contamination from overhead cables impacts air quality within Plaintiff's borders, particularly through lead dust.  This contamination places Plaintiff's residents at risk, decreases the value of both public and private properties, and causes Plaintiff to lose tourism and recreation revenue. Defendants should be compelled to remediate the air contamination caused by their cables.

d. Health Monitoring: Lead exposure poses serious health risks to Plaintiff's residents, especially to vulnerable populations like children, causing the need for costly health monitoring.  Defendants should be compelled to pay for such monitoring.

173.   On information and belief, abating the public health and safety crisis caused by Defendants' products will require extensive resources.

174.   In particular, resources will be necessary to (a) research and implement processes sufficient to identify and trace the abandoned toxic lead cables, (b) develop and execute policies and procedures to recover and destroy abandoned toxic lead cables and remediate harm to the environment, and (c) monitor the health of residents to detect the effects of the public health crisis Defendants have created.

## TOLLING / FRAUDULENT CONCEALMENT

175.    Plaintiff asserts all applicable statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including the discovery rule, equitable tolling, fraudulent concealment, and the continuing violation doctrine.

176.    The discovery rule applies to toll the running of the statute of limitations.  Plaintiff did not know nor could it have reasonably known about the injury or its cause until a date within the applicable statute of limitations for filing Plaintiff's claims.  Plaintiff and Class Members first became aware of Defendants' conduct when the *WSJ* article was published on July 9, 2023.  Even then, the article did not disclose all the locations of the extensive network of lead-sheathed cables throughout New York State (or in the Town of Wappinger) nor did it disclose the extent of the injuries caused by those cables.  It would take far more than reasonable diligence for Plaintiff to discover those locations and the wrongdoing and injuries at each location.

177.    Defendants are estopped from relying on any statute of limitations and/or equitable tolling applies by virtue of Defendants' fraudulent concealment of their wrongdoing.  Defendants affirmatively withheld and/or misrepresented facts concerning the health risks presented by their toxic lead-sheathed cables.  Defendants continue to withhold critical facts by refusing to provide a map of their lead-sheathed cables.  Defendants intended that their actions and omissions would be relied upon, including by Plaintiff.  Plaintiff reasonably relied on Defendants' affirmative misrepresentations, and Defendants' deception deprived Plaintiff of actual or presumptive knowledge of facts sufficient to put it on notice of potential claims.  Due in large part to their deceptive, intentional, and fraudulent conduct, the full scope of Defendants' wrongful conduct and their central role in the public health crisis has not yet come to light.  Plaintiff has been pursuing its rights diligently despite Defendants' misconduct.

178.    Defendants' violations of state law are ongoing.  The lead-sheathed cables remain in place throughout the Town of Wappinger and New York State, where upon information and belief they are leaching lead into soil, sediment, air, and water.  This constitutes ongoing negligence, trespass, and public nuisance.

## SUCCESSOR LIABILITY

179.    To the extent that the wrongful acts or omissions alleged herein were committed or omitted by predecessor entities, their respective successor entities are liable for those acts or omissions because (a) they expressly or impliedly assumed the predecessor's liability, (b) there was a consolidation or merger of predecessor and successor, or (c) the surviving entity was a mere continuation of the predecessor. To the extent there was no formal merger of predecessor and successor, the respective successor entities are also liable for the wrongful acts or omissions of their respective predecessors based on the doctrine of de facto merger based on the factors of (a) continuity of ownership; (b) cessation of ordinary business and dissolution of the predecessor; (c) assumption by the successor of liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; (d) continuity of management, personnel, physical location, assets and general business operation of the predecessor, and (e) assumption of an identical or nearly identical name. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

## ALTER EGO LIABILITY

180.    To the extent that the wrongful acts or omissions alleged herein were committed or omitted by wholly owned or majority-owned entities, the parent entities are liable for those acts or omissions as alter egos because (a) they dominated and controlled the wholly owned or majority-owned entity and (b) exercised that domination and control to perpetrate a wrong or injustice. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

## CLASS ALLEGATIONS

181.    Plaintiff brings this action on behalf of a class of all government units in New York State whose borders contain Defendants' lead-sheathed cables or who are close enough to Defendants' lead sheathed cables such that run off from the cables would affect their property or people.

182.    The Class satisfies the numerosity, commonality, typicality, and adequacy requirements of Federal Rule of Civil Procedure 23(a) for maintaining a class action, because:

183.    The Class is so numerous that joinder of all members is impracticable. Upon information and belief, all communities in New York State have been affected by abandoned toxic lead cables.  Moreover, Defendants have refused to disclose the location of all their lead-sheathed cables.  Therefore, to the extent the cables do not affect all communities in New York State, the specific identity of many of the Class Members is unknown to Plaintiff, and therefore joinder is impractical.

70

184.    Upon information and belief, the number of Class Members is sufficiently numerous to make class action status the most practical method for Plaintiff and Class Members to secure redress for injuries and to obtain class-wide abatement and monetary relief.

185.    There are numerous questions of fact and law common to the Class. The claims in this action are that Defendants are violating state common law of public nuisance, negligence, and trespass.  Common questions of law and fact include:

      i.    whether lead is toxic;

     ii.    whether Defendants' lead-sheathed cables are hazardous waste;

    iii.    whether lead-sheathed cables pose health risks;

    iv.    whether Defendants' lead-sheathed cables were abandoned;

     v.    whether there is a public right to a healthful environment and whether Defendants' conduct violates that right;

    vi.    whether Defendants acted unreasonably in abandoning and failing to mitigate harm from the lead-sheathed cables;

   vii.    whether Defendants were aware of the health risks posed by the lead-sheathed cables to those exposed to the cables;

  viii.    whether the public should be medically monitored to protect against the health risks of lead exposure;

    ix.    whether Defendants should be required to identify, investigate, and publicly disclose the location, condition, and extent of all lead-sheathed telecommunications cables they have owned, operated, maintained, or abandoned in the State of New York;

     x.    whether Defendants should be required to create a fund to pay for ongoing medical surveillance and monitoring to pay for ongoing medical surveillance and monitoring of utility workers that Defendants exposed to the lead-sheathed cables;

    xi.    whether Defendants should be required to abate lead hazards that they know or should know exist due to their lead-sheathed cables; and

   xii.    whether Defendants should be required to warn Plaintiff about the risks posed by Defendants' cables.

186.    Plaintiff the Town of Wappinger's claims and injuries are typical of the claims and injuries of the Class.  The Town's claims arise from the same event, pattern, or practice as the Class's claims: Defendants' abandonment of lead-sheathed cables in or near their borders.  The Town's injury is similar in kind to the Class's injury:  economic cost to the town of clean up and medical monitoring, injury to persons living and working in the affected areas, and property damage associated with the abandoned cables.  Finally, the legal theory is consistent across the Plaintiff and Class Members:  nuisance, negligence, and trespass.

187.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel who is competent and experienced in complex class action litigation and multidistrict litigation in commercial and environmental claims on behalf of municipalities in New York, among others. There is no conflict between the Plaintiff and the Class.

188.    Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff's counsel is unaware of any conflicts of interest between Plaintiff and Class Members with respect to the matters at issue in this litigation.  Plaintiff will vigorously prosecute the suit on behalf of the Class.  Plaintiff is represented by attorneys with substantial experience and expertise in complex and class action litigation who have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Class.

189.    Defendants have acted or have refused to act on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole.

190.    A class action is superior to other available methods for a fair and efficient adjudication of this matter because the prosecution of separate actions by individual Class Members would unduly burden the Court and create the possibility of conflicting decisions.

191.    Class action treatment is superior to any alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.

192.    Individual Class Members' damages are inadequate to justify the costs of prosecuting their claims in any manner other than a class action. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. Class Members are readily identifiable from the Defendants' records.

193.    The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice.

194.    Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the Defendants.

195.    Without a class action, Defendants would retain the benefit of their wrongdoing and will continue a course of action that will result in further injury to Plaintiff and the Class.

## CAUSES OF ACTION

### COUNT 1: PUBLIC NUISANCE

196.    This cause of action is brought against Defendants by the Town of Wappinger on its own behalf and on behalf of the Class (for the purposes of this Count, collectively, "Plaintiffs").

197.    Plaintiffs incorporate the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

198.    The public in New York has a right to a healthful environment, which right includes the right to clean air, soil, and water. This includes the right to be free—on private and public property—from harmful lead contamination or the risk of harmful lead contamination that is not of their own making.

199.    Defendants have interfered and continue to interfere with this right by installing, maintaining, operating, servicing, unreasonably disposing of, and/or abandoning lead-sheathed cables all over New York State. On information and belief, these lead-sheathed cables have contaminated and will continue to contaminate the water, soil, sediment, and air in the Town of Wappinger and other municipalities in New York State, putting peoples' health at serious risk.

200.    Defendants' interference with a public right was substantial: There is an extensive network of dangerous lead-sheathed cables that have been abandoned for decades all over New York, including in the Town of Wappinger. This network of lead cables endangers the property, health, safety, and comfort of a significant number of people.

201.    Defendants' interference with a public right was also unreasonable: Lead is an extraordinarily toxic material that can do extensive damage to the human body. In addition, the externalized risks associated with Defendants' nuisance-creating conduct greatly exceed the internalized benefits, especially where the cables are no longer in use. And Defendants have failed

74

to take any action to mitigate harm from the cables or warn the public of their existence and toxic nature.

202.    Defendants' interference with the public right to a healthful environment was intentional, knowing, reckless, unreasonable, and/or unlawful.

## COUNT 2: NEGLIGENCE

203.    This cause of action is brought against Defendants by the Town of Wappinger on its own behalf and on behalf of the Class (for the purposes of this Count, collectively, "Plaintiffs").

204.    Plaintiffs incorporate the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

205.    Defendants owed a duty to Plaintiffs and to their residents to refrain from contaminating the soil, air, sediment, and water with lead, and to avoid damaging Plaintiffs' land and harming Plaintiffs' residents via the lead-sheathed cables they own within Plaintiffs' borders and in places where run-off affects Plaintiffs.

206.    Defendants' lead-sheathed cables are leaching lead into the environment.

207.    By leaving their lead-sheathed cables within Plaintiffs' borders and in places where lead-containing run-off affects plaintiffs, Defendants have breached their duty of care.

208.    Upon information and belief, as a direct and proximate result of Defendants' negligent conduct, persons residing and working in the communities governed by Plaintiff and Class Members have been exposed to Defendants' toxic lead cables, have sustained a significantly increased risk of developing lead-related health problems, and have suffered and will continue to suffer economic losses and expenses associated with the present need for ongoing medical monitoring.

75

209.    Upon information and belief, as a direct and proximate result of Defendants' conduct, Plaintiffs' land, air, and water have been contaminated with toxic lead, and their residents' health has been placed at significant risk.

## COUNT 3: TRESPASS

210.    This cause of action is brought against Defendants by the Town of Wappinger on its own behalf and on behalf of the Class (for the purposes of this Count, collectively, "Plaintiffs").

211.    Plaintiffs incorporate the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

212.    Plaintiffs own real property that has been contaminated by lead leaching from Defendants' abandoned lead-sheathed cables.

213.    Plaintiffs were and are entitled to the exclusive use, enjoyment, and possession of their property in an uncontaminated physical condition.

214.    Defendants, their agents, or their predecessors-in-interest intentionally entered onto Plaintiffs' land and installed lead-sheathed cables.

215.    The leaching of toxic lead from Defendants' cables was beyond the scope of any permission Defendants had to install and use their cables on Plaintiffs' land.

216.    The leaching of lead onto Plaintiffs' property and into their water was and is an unauthorized and unjustified intrusion onto Plaintiffs' property.

217.    On information and belief, Defendants knew or should have known that their lead-sheathed cables would eventually leach lead into the surrounding environment, including Plaintiffs' soil, air, sediment, and water.

218.    Defendants know or should know that the leaching of lead from their abandoned cables has resulted in an unauthorized physical invasion of Plaintiffs' property, yet they

intentionally refuse to remove and remediate the continuing contamination, or even identify the locations of their abandoned cables, despite Plaintiffs' repeated requests that they do.

219.    Defendants' intentional acts in installing cables sheathed in toxic lead that have contaminated Plaintiffs' soil, air, sediment, and water, as well as Defendants' refusal to remediate and remove this lead from Plaintiffs' property, have caused substantial harm to Plaintiffs.

220.    The continuing presence of Defendants' lead contamination, and their continuing refusal to remediate it, has and continues to directly and proximately cause injury to Plaintiffs by decreasing the value of Plaintiffs' property, causing Plaintiffs to lose tourism and recreation revenue, and increasing the cost of supplying clean water, performing road construction and maintenance, and other public works.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully requests that this Court grant the following relief:

i.    Certify the Class as described herein under Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2), appoint Plaintiff as the representative of the Class, and appoint Plaintiff's counsel as Class counsel;

ii.    Enter judgment in favor of Plaintiff and the Class and against Defendants on all claims;

iii.    Award damages in an amount to be determined at trial;

iv.    Issue a preliminary and permanent injunction requiring Defendants to:

a.    Identify, investigate, and publicly disclose the location, condition, and extent of all lead-sheathed telecommunications cables they have owned, operated, maintained, or abandoned in the State of New York;

77

b.   Submit to the Court a verified and geospatially mapped inventory of all such cables within a time frame set by the Court;

c.   Develop and implement a remediation plan, approved by the Court, for the removal and environmentally sound disposal of lead-sheathed cables and the remediation of lead contamination in affected areas, including but not limited to soil, groundwater, and surface water contamination caused by deteriorating cables; and

d.   Implement a monitoring and maintenance protocol to prevent future environmental release or exposure associated with legacy infrastructure.

v.   Establish a public health program under Court oversight or third-party administration to assess and monitor the health of individuals residing or working within affected communities, and to ensure access to appropriate lead screening and follow-up services, which program should include (a) establishing a trust funded by Defendants to pay for the medical monitoring of everyone who has been exposed to Defendants' lead-sheathed cables; and (b) notifying all persons who live or work in the communities governed by Plaintiff and Class Members, in writing, that they may require frequent medical monitoring for the purpose of diagnosis;

vi.   Award Plaintiff and the Class reasonable attorneys' fees, expert fees, costs of suit, and pre- and post-judgment interest;

vii.   Retain jurisdiction to oversee compliance with the Court's orders;

viii.   Grant such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff, on behalf of itself and the Class, demand a trial by jury on all issues so triable.

Dated: May 30, 2025

<div style="margin-left: 40%">

**NAPOLI SHKOLNIK**

/s/ Hunter J. Shkolnik
HUNTER J. SHKOLNIK

/s/ Paul J. Napoli
PAUL J. NAPOLI

/s/ Nestor D. Galarza
NESTOR D. GALARZA (PRO HAC VICE)
NS PR LAW SERVICES
1302 Avenida Ponce de Leon
Santurce, PR 00907
Tel: (787) 493-5088
Fax: (646) 843-7603
Hunter@nsprlaw.com
PNapoli@nsprlaw.com
NGalarza@NSPRLaw.com


/s/ Salvatore C. Badala
SALVATORE C. BADALA
**NAPOLI SHKOLNIK, PLLC**
400 Broadhollow Road, Suite 305
Melville, NY 11747
Tel: (212) 397-1000
SBadala@napolilaw.com

/s/ Shayna E. Sacks
SHAYNA E. SACKS
**NAPOLI SHKOLNIK, PLLC**
360 Lexington Avenue, 11xth Floor
New York, NY 10017
Tel: (212) 397-1000
SSacks@napolilaw.com

*Counsel for Plaintiff*

</div>

79

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on May 30, 2025, he electronically filed a copy of the attached via the CM/ECF filing system, which sent notification of such filing to all Filing Users.

*/s/ Paul J. Napoli*