UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TOWN OF WAPPINGER, NY, *on behalf of itself and all others similarly situated*,<br><br>*Plaintiff*,<br><br>v.<br><br>VERIZON COMMUNICATIONS INC., *et al.*,<br><br>*Defendants*. | No. 24-CV-9330 (KMK)<br><br><u>ORDER & OPINION</u> |

<u>Appearances</u>:

Paul J. Napoli, Esq.
NSPR Law Services LLC
San Juan, PR
*Counsel for Plaintiff*

Hunter J. Shkolnik, Esq.
Nestor D. Galarza, Esq.
Napoli Shklonik, PLLC
Santurce, PR

Salvatore Charles Badala, Esq
Napoli Shklonik, PLLC
Melville, NY

Shayna E. Sacks, Esq.
Napoli Shkolnik, PLLC
New York, NY
*Counsel for Plaintiff*

Jennifer Lynn Del Medico, Esq.
Jones Day
New York, NY

Bethany K. Biesenthal, Esq.
Alisann Kendall Anderson, Esq.
Jones Day
Chicago, IL

Anderson Bailey, Esq.
Jones Day
Pittsburgh, PA
*Counsel for Defendants Verizon Communications, Inc. and Verizon New York, Inc.*

Devora W. Allon, Esq.
Christopher Xavier Fernandez, Esq.
Kirkland & Ellis, LLP
New York, NY

Hariklia ("Carrie") Karis, Esq.
Mark J. Nomellini, Esq.
Kirkland & Ellis, LLP
Chicago, IL
*Counsel for Defendants AT&T Enterprises, LLC, AT&T Communications of New York, Inc., SBC Long Distance, LLC, and TC Systems, Inc.*

Sean W. Gallagher, Esq.
Steven E. Derringer, Esq.
Tulsi E. Gaonkar, Esq.
Bartlit Beck LLP
Chicago, IL
*Counsel for Defendants AT&T Enterprises, LLC, AT&T Communications of New York, Inc., SBC Long Distance, LLC, and TC Systems, Inc.*

Matthew D. Ingber, Esq.
Rory K. Schneider, Esq.
David Yolkut, Esq.
Mayer Brown LLP
New York, New York
*Counsel for Defendants Frontier Telephone of Rochester Inc., Frontier Communications of Seneca-Gorham, Inc., Ogden Telephone Company, Frontier Communications of Sylvan Lake, Inc., Frontier Communications of Ausable Valley, Inc., and Frontier Communications of New York, Inc.*

Archis A. Parasharami, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Washington, DC
*Counsel for Defendants Frontier Telephone of Rochester Inc., Frontier Communications of Seneca-Gorham, Inc., Ogden Telephone Company, Frontier Communications of Sylvan Lake, Inc., Frontier Communications of Ausable Valley, Inc., and Frontier Communications of New York, Inc.*

KENNETH M. KARAS, United States District Judge:

This is a class action brought by the Town of Wappinger, New York ("the Town" or "Plaintiff"), individually and on behalf of all other municipalities similarly situated against various telecommunications companies ("Defendants") to remedy alleged negligence, trespass, and public nuisance created by an extensive network of toxic lead-sheathed telecommunications cables that Defendants purportedly have abandoned throughout New York State. On behalf of itself and the class, Plaintiff seeks: (1) injunctive relief, including an order directing Defendants to investigate, identify, and disclose the precise location of each lead-sheathed telecommunications cable they have owned, operated, or managed in the State of New York, and to safely remove all such cables and remediate related lead contamination; (2) a court-mandated program or fund to assess and monitor the health of individuals living and working in affected communities and to provide access to appropriate screening and evaluation services; (3) damages in an amount to be determined at trial; and (4) attorneys' fees, costs of suit, and pre- and post-judgment interest.

As relevant here, Defendants Verizon Communications Inc.; Verizon New York, Inc.; MCIMetro Access Transmission Services LLC; MCI Communications Services LLC dba Verizon Business Services; Metropolitan Fiber Systems of New York, Inc.; XO Communications Services, LLC (together, the "Verizon Defendants"); AT&T Enterprises, LLC; AT&T Communications of New York, Inc.; SBC Long Distance, LLC; TC Systems, Inc.; Frontier Telephone of Rochester, Inc. (together, the "AT&T Defendants"); Frontier Communications of Seneca-Gorham, Inc.; Ogden Telephone Company; Frontier Communications of Sylvan Lake, Inc.; Frontier Communications of AuSable Valley, Inc.; Citizens Telecommunications Company of New York, Inc.; Frontier Communications of America, Inc.; Frontier Communications of New

York, Inc.; and Frontier Communications of Rochester, Inc. (together, the "Frontier Defendants") have moved to dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] (Mot. to Dismiss (the "Omnibus Motion") (Dkt. No. 175).) Defendants Frontier Telephone of Rochester, Inc.; Frontier Communications of Seneca-Gorham, Inc.; Ogden Telephone Company; Frontier Communications of Sylvan Lake, Inc.; Frontier Communications of Ausable Valley Inc.; Citizens Telecommunications Company of New York, Inc.; Frontier Communications of America, Inc.; Frontier Communications of New York, Inc.; and Frontier Communications of Rochester Inc. (collectively, the "Frontier Defendants") have also moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). (Mot. to Dismiss Am. Compl. (the "Frontier Motion") (Dkt. No. 178).)

For the reasons set forth below, Defendants' Motions are granted.

## I. Background

The following facts are drawn from the Amended Complaint, (Am. Compl. (Dkt. No. 169)), and the documents that it incorporates, and assumed true for the purposes of deciding the Motion to Dismiss, *see Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

### A. Facts

Beginning as early as 1888, telecommunications companies in the United States produced and used telephone cables with lead sheathing, installing them overhead, in the soil, in buildings, and underwater. (Am. Compl. ¶¶ 52–53.) During the 1960s, however, lead-sheathed cables fell out of favor as plastic sheathing and paper insulators, and eventually polyethylene insulation and

[1] The Amended Complaint names additional defendants, including Chautauqua & Erie Communications, Inc., Consolidated Communications of New York Company, Windstream New York, Inc., Ontario & Trumansburg Telephone Company, and DFT Communications Corporation.

fiber systems, rose in popularity. (*Id.* ¶¶ 54, 56.) Many smaller telecommunications companies slowly began removing and replacing lead-sheathed cables, but several major companies, like Defendants and their predecessors, allegedly chose to abandon the dead lead-sheathed cables in place. (*Id.* ¶¶ 53, 55–56.)

On July 9, 2023, the *Wall Street Journal* ("WSJ") published an article titled "America Is Wrapped in Miles of Toxic Lead Cables," which reported that telecommunications companies left approximately 2,000 lead-sheathed cables in place in the United States, cables extending across 66,000 miles nationwide. (*Id.* ¶¶ 58–59.) WSJ reporters visited about 300 lead-sheathed cable sites to collect and test environmental samples, which revealed that lead levels in the environment near Defendants' lead-sheathed cables exceed the safety recommendations set by the Environmental Protection Agency ("EPA"). (*Id.* ¶ 60.)[2] Researchers attributed the elevated lead levels to the abandoned cables. (*Id.* ¶¶ 60–61.)

Marine Taxonomic Services, Ltd. ("MTS") assisted the WSJ in the investigation described in the article. (*Id.* ¶ 68.) In conducting the investigation, MTS and the WSJ reviewed thousands of records, historical permits, NOAA navigational charts, and geographic indicators to determine which locations to prioritize. (*Id.* ¶ 69.) Then, within the chosen locations, MTS and the WSJ determined whether lead-sheathed cables were present; visually assessed the composition of the cables; and collected samples of water, sediment, and soil in the immediate vicinity to test for lead. (*Id.* ¶ 70.)

---

[2] The EPA sets recommended "lead screening levels" to identify conditions that may pose a health risk and thus warrant further evaluation. (Am. Compl. ¶ 60.) As of January 2024, the lead screening level recommended by the EPA for residential soil where children are likely to play is 200 parts per million ("ppm"), except for in areas where there are multiple known sources of lead exposure (such lead-based paint, drinking water pipes, telecom lead-sheathed cables or elevated ambient air levels), for which the EPA recommends a more protective screening level of 100 ppm. (*Id.*)

New York State, and specifically the Hudson River, was identified as a priority location during the investigation. (*Id.* ¶ 69.) Within New York, MTS and the WSJ screened twenty-three different site locations containing thirty-seven points of interest, and they discovered fourteen points of interest with visible lead-sheathed cables. (*Id.* ¶ 71.) Three of these points of interest (specifically, an overhead, lead-sheathed cable; a damaged, out-of-service, lead-sheathed cable; and a splice box at the base of a telephone pole) are located in Wappingers Falls in Dutchess County. (*Id.* ¶ 72.) The first point of interest (the overhead, lead-sheathed cable) is located near a grassy play area called Temple Park Playground. (*Id.*) The second and third points of interest (the damaged cable and the splice box/telephone pole) are located on a sidewalk adjacent to Wappinger Creek, close to a storm drain that is identified as draining into a waterway. (*Id.* ¶¶ 73–74.)

A few days after the WSJ article was published, several New York state agencies conducted soil sampling in Wappingers Falls in the area near the first point of interest, the overhead, lead-sheathed cable. (*Id.* ¶ 78.) The Bureau of Toxic Substance Assessment ("BTSA") published a report discussing the results of this investigation (the "BTSA Report"). *See generally* Press Release, Bureau of Toxic Substance Assessment, N.Y. State Dep't of Health, *Sampling Report for Lead in Soil at Temple Park Playground and Adjacent Areas, Dutchess Terrace and Market Street, Wappingers Falls, New York* (July 27, 2023), https://health.ny.gov/press/releases/2023/docs/wappingers_falls_report.pdf [https://perma.cc/8EM8-R7KJ]. While the BTSA Report indicated that several of the soil samples had a lead concentration higher than the EPA's currently recommended screening level of 200 ppm, *id.* at 2–3, the EPA's recommended screening level was 400 ppm at the time the Report was published, (Am. Compl. ¶¶ 80–81, 83). Moreover, the BTSA Report noted that the soil samples directly under the cable were located

along the roadway and "therefore more appropriately compared to the HUD/EPA general soil guidance value of 1200 ppm," and that it was not possible to clearly identify the cause of elevated lead levels directly underneath the cable because roads are a common source of lead. *See* BTSA Report 7. The BTSA Report ultimately concluded that "there was not a clear gradation of elevated lead underneath the cable" and that the agencies' findings "d[id] not provide evidence for excessive or widespread lead contamination in soil due to the telecommunication cable lines and d[id] not suggest a significant exposure or public health risk for people involved in recreational activities at this location." *Id.* (*See* Am. Compl. ¶ 81.)

In September 2023, Verizon announced that it had engaged third-party experts to test lead levels in the soil near the cables highlighted by the WSJ article, including those in Wappingers Falls. (*See* Am. Compl. ¶ 82.) This investigation demonstrated that, consistent with the BTSA Report, lead levels were "generally similar to lead levels in background samples and d[id] not pose a public health risk." Letter from Robert S. Fisher, Senior Vice President Federal Government Relations, Verizon, to Representative Ryan, 1 (Sept. 11, 2023) https://www.verizon.com/about/sites/default/files/2023-09/Verizon-Lead-Test-Results.pdf [https://perma.cc/3NEG-YPAJ].

The Town is located in Dutchess County, adjacent to Wappingers Falls. (Am. Compl. ¶¶ 15, 72.) The Town alleges upon information and belief that lead-containing cables run parallel north and south along Wappinger Creek throughout the Village of Wappinger and the Town of Wappinger, forming a "sprawling network" of cables through the Town of Wappinger's residential areas. (*Id.* ¶¶ 86, 90.) In particular, the Town alleges that cables run southbound towards the location of one of the soil samples discussed in the BTSA Report, which was located along the roadway directly under the cable and had a lead concentration of 410 ppm. (*Id.* ¶¶ 87–

89.) *See* BTSA Report 3, 7. The Town alleges, also upon information and belief, that "just as Defendants' lead-sheathed cables are leaching lead into the environment . . . in the Village of Wappingers Falls adjacent to the Town of Wappinger, they—including successive segments of those same cables—are leaching lead into the environment in the Town of Wappinger." (Am. Compl. ¶ 85.)

Additionally, the Town alleges that the damaged cable identified by MTS as the second point of interest in Wappingers Falls "has leached and will continue to leach lead into the soil and waterways, including into Wappinger Creek," and that the Atlas Wellfield, a primary source of drinking water for the Town of Wappinger, is located along Wappinger Creek. (*Id.* ¶¶ 76–77, 97.) The Amended Complaint states that lead can enter municipal water supplies by "leaching from infrastructure materials" and via "environmental runoff from contaminated soils," and alleges upon information and belief that "Defendants' abandoned cables, many of which are submerged or buried near surface and groundwater resources, have contributed to lead contamination in Plaintiff's water sources and pose a serious ongoing risk of continued contamination." (*Id.* ¶ 98.) As support for this point, the AC cites the United Wappinger Water Improvement District's *Annual Drinking Water Quality Report for 2023*, which reported that one sample collected in Wappinger Falls's distribution system exceeded the legal threshold for water in schools. (*Id.* ¶ 99.) While the report does indicate that one drinking water sample contained elevated lead levels, it notes that such a finding is typically caused by "[c]orrosion of household plumbing system[s]" or "erosion of natural deposits." United Wappinger Water Dist., *Annual Drinking Water Quality Report for 2023*, 4 (2023), https://townofwappingerny.gov/wp-content/uploads/2024/05/AWQR-UWW-2023-final.pdf [https://perma.cc/R6Y7-BL4K] ("2023 Water Report"). Moreover, the sample was from tap water "collected for lead and copper analyses

from sample sites throughout the community," rather than from Atlas Wellfield or any of the Town's other water sources. *Id.*

Similarly, while the Amended Complaint represents that the EPA's "How's My Waterway" database classifies portions of Wappinger Creek as "impaired" for certain uses, (Am. Compl. ¶ 101), this classification results from contaminants other than lead, *see How's My Waterway?*, EPA, https://mywaterway.epa.gov/community/Wappinger/identified-issues [https://perma.cc/2DN9-LBKK] (last visited Sept. 11, 2026). The Amended Complaint also describes an EPA report that found that creek sediments downstream of an industrial park in Wappingers Falls contained elevated levels of "several inorganic constituents," including lead. (Am. Compl. ¶ 102 (citing *Superfund Site*, EPA, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.cleanup&id=0201758&utm [https://perma.cc/NY3K-R8PZ] (last visited Sept. 11, 2026)).) The Amended Complaint then alleges upon information and belief that lead-sheathed cables were "historically installed in and around the [industrial park], which housed multiple heavy industrial operations during the era in which lead-sheathed cable was commonly used," and that Defendants' failure to remove any lead-sheathed cables "in or around this site" raises "substantial concerns about potential contribution to ongoing environmental risks in the area." (*Id.* ¶ 103.) While the Amended Complaint acknowledges that the Atlas Wellfield is upstream of this industrial park and thus not implicated by the EPA's findings, it alleges that "its location within an already burdened waterway heightens concern regarding potential cumulative impacts from additional sources, including abandoned lead-sheathed telecommunications cables," and that "the presence or suspected presence of toxic legacy infrastructure in or near the impaired segment of Wappinger Creek necessitates ongoing environmental scrutiny, mitigation, and transparent disclosure by Defendants." (*Id.* ¶ 104.)

The Amended Complaint discusses at length the health risks posed by lead exposure, particularly for children, and notes that there is no safe level of lead in the human body. (*Id.* ¶¶ 108–17.) It also explains that individuals exposed to lead may not show any symptoms until decades after exposure. (*Id.* ¶ 120.)

The Amended Complaint also alleges that Defendants were aware that their lead-sheathed cables endangered both the environment and human health, as several studies and articles have indicated that telecommunications employees who regularly worked with lead cables regularly had high levels of lead in their blood and often experienced health issues as a result. (*Id.* ¶¶ 126–33, 136–38, 145.) Moreover, at a gathering of telecommunications companies in 2010, a senior AT&T manager warned other telecommunications officials that "[s]ome older metropolitan areas may still have over 50% lead cable" and that "soils retained between 83 and 98 percent of the released lead within 2 inches" of lead-sheathed cables. (*Id.* ¶ 134.) In 2019, the Department of Environmental Protection alerted Verizon to the presence of lead-sheathed cables in underground ducts in Brooklyn and other locations in New York State. (*Id.* ¶¶ 139–41.)[3] And in July 2023, AT&T admitted in public filings and internal emails that it owned lead-sheathed cables that had not been removed, but claimed that such cables comprised less than 10% of its two million miles of its nationwide network and were mostly either buried or in conduit. (*Id.* ¶ 149.)

As part of its investigation into the existence and potential risks of lead-sheathed cables, the New York State Department of Public Service ("DPS") requested that 246 telecommunications firms and smaller local phone companies provide information to help DPS

[3] The Amended Complaint does not allege that any of these locations are within the Town.

ascertain the location of lead-sheathed cables in New York. (*Id.* ¶ 157.) In response, Defendants acknowledged that such cables exist, but denied that they pose a risk to public health or the environment. (*Id.* ¶¶ 158–61.) In particular, the Verizon Defendants argued that they were not required to disclose the information requested in the DPS investigation under the Freedom of Information Law ("FOIL"), because such information constituted trade secrets, confidential commercial information and/or critical infrastructure information. (*Id.* ¶ 162.)[4] They did, however, provide DPS with a spreadsheet providing an inventory of Verizon's New York network to the extent that the data was available and identifying cables that were known or suspected to be lead-sheathed. (*Id.*) This spreadsheet is not available to the public. (*Id.*) As for the AT&T Defendants, they admitted that approximately 690 miles of lead cable remain in place in their networks, including in New York. (*Id.*) As to where these cables were located, however, the Amended Complaint alleges that the AT&T Defendants' disclosures were insufficiently specific to "allow testing to determine the extent of the contamination in their corresponding geographic locations." (*Id.*) Similarly, the Frontier Defendants[5] acknowledged that lead-

[4] Verizon also opposed the WSJ's FOIL request in November 2023 and commenced a CPLR Article 78 petition to prevent disclosure of the location of its lead-sheathed cables in New York. (Am. Compl. ¶ 163.) Likewise, when the United States Securities and Exchange Commission sent a letter to Verizon in March 2024 regarding a proposal that Verizon identify and publicly disclose the location of lead-sheathed cables along with the potential cost of remediation, Verizon sought to exclude the proposal from its proxy materials to avoid disclosure. (*Id.* ¶ 164.) And in oral argument before the Third Judicial Department in *Verizon New York, Inc. et al. v NYSPSC,* 24-CV-245, Verizon continued to argue against disclosure, representing to the court that disclosure could cause competitive harm and was not a public health issue. (*Id.* ¶ 168.)

[5] The Amended Complaint defines "Frontier Defendants" as also including XO Communications Services, LLC, (Am. Comp. ¶ 35), but XO Communications Services is also included within the definition of "Verizon Defendants," (*id.* ¶ 18), and defined as a wholly owned subsidiary of Verizon Communications, (*id.* ¶ 25). The Court thus assumes that the inclusion of XO Communications Services as one of the Frontier Defendants was in error.

sheathed cables represented a "single-digit percentage" of their approximately 685,000 miles of metallic cabling, but did not disclose sufficient information about the location of these cables for testing purposes. (*Id.*)

In March 2024, after hundreds of feet of abandoned cables were discovered in several New York counties, a group of elected officials, environmental advocates and concerned community members called on Verizon and AT&T to publicly release information about the locations of all lead-sheathed cables. (*Id.* ¶ 165.) In response, Verizon stated that, while it took the community's concerns seriously, many lead-sheathed cables "are still used in providing critical voice and data services, including access to 911 and other alarms, to customers nationwide." (*Id.* ¶ 166.)

B. Procedural History

Plaintiff filed its initial Complaint in the Supreme Court of the State of New York, New York County on November 12, 2024, asserting claims for negligence (including gross negligence), negligence per se, common law public nuisance, restitution and indemnification. (Not. of Removal ¶ 1 (Dkt. No. 1); Compl. (Dkt. No. 1-3).) On December 6, 2024, Defendants removed the action to the District Court for the Southern District of New York, after which point it was transferred to White Plains and assigned to Judge Cathy Seibel ("Judge Seibel"). (*See* Not. of Removal; Dkt. (entry dated Jan. 13, 2025 reassigning case to Judge Seibel).) On March 7, 2025, all of the entities named as defendants filed a letter requesting a conference to discuss their anticipated motion to dismiss, (Letter from Jennifer L. Del. Medico, Esq. to Judge Seibel (Mar. 7, 2025) (Dkt. No. 158)), and several Defendants filed separate letters asserting additional grounds for dismissal, (Letter from Matthew D. Ingber, Esq. to Judge Seibel (Mar. 7, 2025) (Dkt. No. 159); letter from Richard S. Krumholz, Esq. to Judge Seibel (Mar. 7, 2025) (Dkt. No. 160).)

Plaintiff responded on March 25, 2025, (Letter from Paul J. Napoli *et al.* to Judge Seibel (Mar. 25, 2025) (Dkt. No. 164); Letter from Paul J. Napoli *et al.* to Judge Seibel (Mar. 25, 2025) (Dkt. No. 165)), and Judge Seibel held a conference on April 1, 2025, during which she granted Plaintiff leave to amend the complaint and set a briefing schedule, (*see* Dkt. (minute entry dated Apr. 1, 2025)).

Plaintiff filed the Amended Complaint on June 2, 2025, asserting claims for public nuisance, negligence and trespass. (*See generally* Am. Compl.) On July 11, 2025, Plaintiff voluntarily dismissed certain entities named as defendants pursuant to Fed. R. Civ. P. 41 (a)(1)(A)(i). (ECF No. 171.) The instant Motions followed.

On May 5, 2026, the case was reassigned to this Court. (*See* Dkt. (notice of case reassignment).)

## II. Discussion

### A. Standard of Review

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical.'" *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)).

#### 1. Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (citation and quotation marks omitted).[6] "Determining the existence of

[6] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation and quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question" (quotation marks omitted)).

The Second Circuit has explained that a challenge to subject-matter jurisdiction pursuant to Rule 12(b)(1) may be facial or fact-based. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). When a defendant raises a facial challenge to standing based solely on the complaint and the documents attached to it, "the plaintiff has no evidentiary burden" and a court must determine whether the plaintiff asserting standing "alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Id.* (alterations omitted) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)). In making such a determination, a court must accept as true all allegations in the complaint and draw all inferences in the plaintiff's favor. *Id.* at 57. However, where a Rule 12(b)(1) motion is fact-based and a defendant proffers evidence outside the pleadings a plaintiff must either come forward with controverting evidence or rest on the pleadings if the evidence offered by the defendant is immaterial. *See Katz v. Donna Karan Co., LLC*, 872 F.3d 114, 119 (2d Cir. 2017). If the extrinsic evidence presented by the defendant is material and controverted, the Court must make findings of fact in aid of its decision as to standing. *See Carter*, 822 F.3d at 57.

2. Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and

"draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same). Courts regularly apply these doctrines to consider articles relied upon in drafting a complaint—and particularly those cited and quoted from in the pleading. *See, e.g.*, *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 428 n.4 (2d Cir. 2025) ("The district court was well within its authority to consider the [news] article, which Plaintiffs cite and quote from extensively in their complaint."); *Savage v. NYP Holdings, Inc.*, No. 24-CV-3278, 2025 WL 2687992, at *1 n.1 (S.D.N.Y. Sept. 19, 2025) (drawing "facts from the at-issue publications themselves, as a court on a motion to dismiss may consider documents that are incorporated by reference and/or integral to the amended complaint"); *Hill v. New York Post*, No. 08-CV-5777, 2010 WL 2999795, at *2 n.1 (S.D.N.Y. May 28, 2010) (considering "articles mentioned in the complaint" on a motion to dismiss on the grounds that a complaint may be deemed to include documents incorporated by reference), *report and recommendation adopted*, 2010 WL 2985906 (S.D.N.Y. July 29, 2010). The Court may therefore consider the articles and reports cited to, quoted, and relied on by Plaintiff in the Amended Complaint for purposes of analyzing Defendants' Motions.

B. Analysis

1. Fact-Based Challenge to Standing

As noted above, the Frontier Defendants, in addition to joining the Omnibus Motion, filed a separate motion seeking to dismiss for lack of subject matter jurisdiction. (*See generally* Frontier Mot.) Specifically, the Frontier Defendants argue that "to the extent the Town's claims rest on the presence of lead-sheathed cables in Wappinger, those claims fail for lack of Article III standing." (Mem. of Law in Supp. of the Frontier Defs.' Mot. to Dismiss ("Frontier Mem.") 1 (Dkt. No. 179).)

"Constitutional standing is the threshold question in every federal case, determining the power of the court to entertain the suit." *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 184 (2d Cir. 2001). To establish the constitutional minimum of standing, a plaintiff must show the following three elements: "(i) that [plaintiff] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (describing the three elements, and explaining that the "plaintiff, as the party invoking federal jurisdiction, bears the burden" of establishing their existence). "In the context of an alleged class action like the case at hand, plaintiffs must show 'that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Kell v. Lily's Sweets, LLC*, 23-CV-147, 2024 WL 1116651, at *3 (S.D.N.Y. Mar. 13, 2024) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

As mentioned above, a defendant moving to dismiss pursuant to Rule 12(b)(1) may proffer evidence outside the pleadings when making a fact-based motion seeking dismissal on standing grounds. *See Lugo v. City of Troy*, 114 F.4th 80, 87 (2d Cir. 2024) ("[I] n a fact-based motion, the defendant can proffer evidence outside the pleadings to challenge the plaintiff's allegations of standing."); *Kouyate v. Bai Brands, LLC*, No. 24-CV-3993, 2025 WL 722874, at *1 (S.D.N.Y. Mar. 6, 2025) (explaining such materials may be offered on a fact-based motion, at which point the plaintiff must come forward to controvert the defendant's evidence). Nonetheless, "[i]f the evidence proffered by the [d]efendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing, then the [c]ourt need only rely on the allegations in [the] [p]laintiff's [c]omplaint." *Ham v. Lenovo (United States) Inc.*, 664 F. Supp. 3d 562, 575 (S.D.N.Y. 2023); *see also Carter*, 822 F.3d at 57 (substantially same).

In support of their argument, the Frontier Defendants submitted a sworn declaration from the company's local manager based in New York. (Decl. of Walter Cotter in Supp. of Frontier Defs.' Mot. to Dismiss ("Cotter Decl.") ¶ 2 (Dkt. No. 180).) That declaration certifies that the Frontier Defendants reviewed their records and conducted field inspections regarding telecommunications and cable facilities and did not identify any lead-sheathed cables in the Town. (*Id.* ¶ 5.) As the Frontier Defendants acknowledge, (*see* Frontier Mem. 4, 6), the Amended Complaint alleges upon information and belief that the Frontier Defendants "own[]" and manage[] lead-sheathed cables in the Town of Wappinger *and/or in an area nearby where run-off affects the Town of Wappinger*," (Am. Compl. ¶¶ 37–45 (emphasis added).) Therefore, the alleged misconduct on which Plaintiff bases its claims is not limited to the maintenance of lead-sheathed cables within the Town's borders; it also encompasses Defendants' ownership of

cables that are located outside the Town but are nonetheless alleged to have caused the Town harm via lead carried in runoff. As to these runoff allegations, the Frontier Defendants seek to dismiss pursuant to Rule 12(b)(6), arguing that Plaintiff's runoff theory is unsupported and cannot state a plausible claim. (Frontier Mem. 1–2; Reply Mem. of Law in Further Supp. of the Frontier Defs.' Mot. to Dismiss ("Frontier Reply") 4 (Dkt. No. 183) ("[A]llegations relating to 'nearby' cables are insufficient to state a claim on the merits.").) The Frontier Defendants do not argue that Plaintiff lacks standing to assert its claims under the runoff theory; indeed, they expressly limit their standing argument "to challenging the Town's standing to assert claims resting on the (disproven) allegation that Frontier owns and manages lead-sheathed cables in the Town of Wappinger." (Frontier Reply 4.)

Although "standing is not dispensed in gross" and "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek," *TransUnion*, 594 U.S. at 413, "[s]tanding is analyzed on a claim-by-claim basis, not a violation-by-violation . . . basis," *Simon v. Scripps Networks, LLC*, No. 24-CV-8175, 2025 WL 3167915, at *4 (S.D.N.Y. Nov. 13, 2025); *see also Point12 Diversified Fund, LP v. TMC The Metals Co.*, No. 21-CV-5991, 2025 WL 1920340, at *9 (E.D.N.Y. July 11, 2025) ("Article III standing is assessed on a claim-by-claim, not fact-by-fact, basis."). The Frontier Defendants' attempt to frame Plaintiff's allegations regarding lead-sheathed cables within the Town's borders as a distinct "claim" falls short. The Frontier Defendants do not explain how the Court could dismiss Plaintiff's claims insofar as they are premised on Frontier's cables being present in the Town *directly* while standing nevertheless exists insofar as those *same claims* are premised on the runoff theory, which the Frontier Defendants appear to concede. As the Frontier Defendants have made a fact-based challenge to only one of the two theories of liability in Plaintiff's Amended Complaint, the

Cotter Declaration is immaterial, and the Court may limit its analysis to the allegations in the Amended Complaint. *Ham*, 664 F. Supp. 3d at 575; *see also Esquibel v. Colgate-Palmolive Co.*, No. 23-CV-742, 2025 WL 1785865, at *4–5 (S.D.N.Y. June 27, 2025) (holding that, where the defendants failed to provide sufficient evidence to contradict the plaintiffs' plausible allegations in the complaint, the court would reject a fact-based challenge to standing).

2. Facial Standing

As already described, the Frontier Defendants do not contest Plaintiff's standing to assert the runoff theory, and the Memorandum of Law submitted in support of the Omnibus Motion does not purport to contest standing whatsoever. (*See* Frontier Mem.; Mem. of Law in Supp. re: Mot. to Dismiss ("Omnibus Mem.") (Dkt. No. 176).) Nevertheless, " [a] federal court must satisfy itself that it has subject matter jurisdiction over a case before it may adjudicate the merits and may raise the issue of standing *sua sponte* at any time." *Manning v. City of N.Y.*, No. 23-CV-2352, 2024 WL 3480437, at *2 (S.D.N.Y. July 19, 2024). Here, Plaintiff has failed plausibly to allege an injury-in-fact, whether resulting from runoff or otherwise, and so the Amended Complaint must be dismissed in full.

The Omnibus Motion seeks to dismiss the Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), and it does not purport to contest Plaintiff's standing to pursue its claims. (*See generally* Omnibus Mot.; Omnibus Mem.; *see also* Reply Mem. of Law in Supp. of Mot. to Dismiss ("Omnibus Reply") 7 (Dkt. No. 184) (taking the position that Plaintiff "recharacterize[ed] Defendants' 12(b)(6) motion as a 12(b)(1) motion . . . [even though] Defendants' motion argues only that the Town failed to adequately plead the elements of its claims").) The substance of the arguments in the Omnibus Motion, however, is that Plaintiff has failed to plausibly allege any injury. (*See, e.g.*, Omnibus Mem. 5 ("[T]he Town

has failed to identify any of its property, air, or water allegedly contaminated or otherwise harmed by lead-sheathed cable. It has likewise failed to identify any injury that any of its residents have suffered.").) And if Defendants are correct on this point, then Plaintiff lacks standing, *Catalano v. Grimmway Enters., Inc.*, No. 24-CV-8817, 2026 WL 710124, at *5 (S.D.N.Y. Mar. 13, 2026) (explaining that failure to allege "a concrete injury, economic or otherwise" means that the plaintiff "lacks standing"), and the Court must dismiss the Amended Complaint on this basis, *see Manning*, 2024 WL 3480437, at *2–6 (holding that without cognizable harms, the plaintiff lacked standing to assert claims).

"While the standard for reviewing standing at the pleading stage is lenient, a plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing." *Baur v. Veneman*, 352 F.3d 625, 636–37 (2d Cir. 2003); *see also Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 76 (2d Cir. 2022) (same). In the Amended Complaint, Plaintiff alleges that its injuries include soil contamination, water contamination, air contamination and the "need for costly health monitoring." (Am. Comp. ¶ 172.) The allegations in support of these purported injuries, however, are either conclusory or describe contamination outside of the Town's borders.

Plaintiff argues, and Defendants dispute, that the Court should credit the Amended Complaint's allegations of contamination made "on information and belief." (*See* Mem. of Law in Opp'n to Defs.' Omnibus Mot. ("Pl.'s Omnibus Opp'n") 3 (Dkt. No. 181) (acknowledging that the Amended Complaints's allegations that lead-sheathed cables "are actively leaching lead into the surrounding environment, contaminating soil and the Town's water supply" are made on information and belief).) According to Plaintiff, "Defendants' exclusive control of information

about the location and condition of their abandoned cables makes such pleading not only permissible, but necessary." (Pl.'s Omnibus Opp. 8.)

"Pleading on information and belief is permitted if the facts in question are 'peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.'" *Goodman v. Goodman*, No. 21-CV-10902, 2022 WL 17826390, at *12 (S.D.N.Y. Dec. 21, 2022) (quoting *Citizens United v. Schneiderman*, 882 F.3d 374, 384–85 (2d Cir. 2018)), *report and recommendation adopted*, 2023 WL 1967577 (S.D.N.Y. Feb. 12, 2023); *see SUEZ Water N.Y. Inc. v. E.I. du Pont de Nemours & Co.*, No. 20-CV-10731, 2023 WL 2601161, at *7 n.5 (S.D.N.Y. Mar. 22, 2023) (substantially same). "But a litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory, particularly when a plaintiff can acquire at least some information that would connect a defendant to the alleged wrongdoing." *Goodman*, 2022 WL 17826390, at *12; *see also New Yorkers for Religious Liberty, Inc. v. City of N.Y.*, 125 F.4th 319, 332 (2d Cir. 2025) (same, declining to rely on information so alleged), *cert. denied sub nom. Kane v. City of N.Y.*, 146 S. Ct. 993 (2025); *Evergreen E. Coop. v. Whole Foods Mkt., Inc.*, No. 21-2827-CV, 2023 WL 545075, at *2 (2d Cir. Jan. 27, 2023) (summary order) (same, and explaining that where the plaintiff "could have gone" and acquired additional information through examining and inspecting, the facts were not uniquely within the defendant's control).

As Plaintiff points out, (Pl.'s Omnibus Opp. 8), the location of each of Defendants' lead-sheathed cables is not publicly available information, (Am. Compl. ¶¶ 162–63). But while this may have prevented Plaintiff from precisely identifying the location of each lead-sheathed cable attributable to each Defendant, it does not follow that this absence of information wholly prevented Plaintiff from developing facts demonstrating that it had suffered *any* injury

attributable to *any* Defendant. *See Evergreen East Cooperative*, 2023 WL 545075, at *2 (declining to rely on allegations made "on information and belief" where items that were the subject of the litigation were made available to the general public, and therefore were not "peculiarly within [the defendant's] possession or control," such that the plaintiff "could have gone . . . and examined one or more of the [items]"); *Zeitlin v. Palumbo*, 532 F. Supp. 3d 64, 69 (E.D.N.Y. 2021) (allegations on information and belief were insufficient because where a plaintiff can acquire at least some information in support of its claims, "the mere mention of the possibility of wrongdoing cannot be enough").

First, as the Amended Compliant makes clear, certain lead-sheathed cables are visibly identifiable. (*See* Am. Compl. ¶¶ 71–72, 95.) The Court thus sees no reason why Plaintiff could not have simply looked for cables within its borders—particularly given that there are various locations discussed throughout the Amended Compliant, including those discussed in the WSJ article, in which lead-sheathed cables were seemingly identified without input from Defendants. (*See, e.g.*, *id.* ¶¶ 69–72.)[7] *See Mendez v. Grovehouse Hosp., LLC*, No. 25-CV-1646, 2026 WL 1470288, at *6 (E.D.N.Y. May 26, 2026) (declining to credit allegations made on information or belief when "[f]ar from being peculiarly within the [d]efendants' knowledge, this information would have been personally available to [the] [p]laintiff" because the plaintiff would have been

[7] Moreover, the declaration submitted by Plaintiff in support of its opposition, (*see* Pl.'s Omnibus Opp'n, Ex. 1 ("Perez Decl." or the "Perez Declaration") (Dkt. No. 181-1)), indicates that Plaintiff's expert was able to identify lead-sheathed cables simply by driving through the Town and looking for them, (*see id.* ¶¶ 7–8). While, as discussed further below, the Perez Declaration is both improper and immaterial, it is unclear how Plaintiff can square the Declaration's contents with its contention that "the Town cannot independently confirm the precise locations of lead-sheathed cables because Defendants have uniquely controlled and withheld that information." (Pl.'s Omnibus Opp'n 12; *see also id.* at 13 ("[T]he profoundly secretive nature of the locations has caused Plaintiff to be unable to identify concrete evidence as to the location of Defendants' cables within its geographical area.").)

present during alleged instances of misconduct); *Evergreen East Cooperative*, 2023 WL 545075, at *2 (explaining that the plaintiff could and should have tested items at issue where those items were available to it).

Second, and more fundamentally, there is nothing preventing from the Town from inspecting its own water, soil or air to determine whether lead contamination is present. *See Goodman*, 2022 WL 17826390, at *12 (disregarding allegations made on information and belief because "[w]hile [the] [d]efendant[s] undoubtedly know[] information about her actions that [the] [p]laintiff does not, the salient facts are not peculiarly within the [d]efendant[]s possession or control"). Yet, the Amended Complaint does not allege that any soil or water within the Town has actually been tested and demonstrated elevated levels of lead. Instead, Plaintiff merely throws its (metaphorical) hands up and contends that "Defendants have not provided sufficient specificity as to the locations of lead-sheathed cables in the state that would allow testing to determine the extent of the contamination in their corresponding geographic locations." (Am. Compl. ¶ 162.) But even if Plaintiff cannot determine the full "extent of the contamination," (*id.*), this does not excuse it from providing facts suggesting that *any* contamination exists within Town borders, particularly given its allegation that such contamination is "widespread" throughout the Town, (*id.* ¶ 93).[8] *See Saedi v. Coterie Baby, Inc.*, No. 24-CV-3893, 2024 WL 4388401, at *5–6 (S.D.N.Y. Oct. 3, 2024) (declining to credit allegations made on information and belief that products contained PFAS where the complaint contained only allegations about

---

[8] Indeed, while the Town notes that one of the lead-sheathed cables identified by the MTS runs through the Town, thus suggesting that segments of the same cable within the Town may also be sheathed in lead, (Am. Compl. ¶¶ 86–90), there is no indication that the Town even tested the soil surrounding this cable.

the prevalence of PFAS in dust and "allege[d], without factual enhancement, that the defendant's products are routinely contaminated with PFAS").

Nor are Plaintiff's "information and belief" allegations based "on factual information that makes the inference of culpability plausible." *Goodman*, 2022 WL 17826390, at *12; *see also SUEZ Water*, 2023 WL 2601161, at *7 n.5 (same). Rather, Plaintiff seeks to extrapolate, from factual allegations pertaining to findings of contamination in *other* areas throughout New York state, that each Defendant must also maintain cables within or near the Town that are leaching lead onto Town property. In particular, Plaintiff relies heavily on reports that it characterizes as establishing that lead-sheathed cables have caused widespread contamination throughout New York. But reliance on the facts contained in these reports is insufficient on its own to support Plaintiff's standing for two reasons. First, as outlined above, the most detailed allegations involve the presence of contaminants in areas outside the Town's borders, such as Wappinger Falls. The relevant question here is not whether Plaintiff has established that it is plausible that Defendants caused elevated lead levels in *Wappinger Falls*. Instead, it is whether Plaintiff has plausibly alleged that there is contamination within the Town of Wappinger itself. Thus, even if *Wappingers Falls* could state a plausible claim based on the allegations in the Amended Complaint, the Amended Complaint's contents do not provide a basis to conclude that *Plaintiff* has standing to sue without any concrete facts supporting such an inference.

Second, it is not clear from the cited reports that Defendants' cables caused injury even within the areas tested. For example, the BTSA Report (which again, discuses Wappinger Falls) specifically found that "there was not a clear gradation of elevated lead underneath the cable." *See* BTSA Report 7. And while Plaintiff makes much of the fact that several soil samples were reported to contain quantities of lead higher than the EPA's updated guidance, the report clarifies

that the samples taken "directly under the cable" were also "close to the road (a common source of lead)" and (for this and other reasons, concludes that the results are "not suggest[ive] [of] a significant exposure or public health risk . . . at Temple Park." BTSA Report at 7. Plaintiff asks the Court to infer from this report that Defendants' cables are the cause of elevated lead levels in Wappingers Falls, despite the report's equivocation on this issue, asserting that this "is precisely the type of factual dispute that cannot be resolved at the pleading stage." (Pl.'s Omnibus Opp. 11.) It is true that the test at the motion to dismiss stage "is whether the complaint is plausible, not whether it is less plausible than an alternative explanation." *Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 394 n.8 (S.D.N.Y. 2020); *see also Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019) ("[I]t is not the district court's province to dismiss a plausible complaint because it is not as plausible as the defendant's theory."). But this equivocation, combined with the failure to allege specific facts as to the Town of Wappinger, is fatal to Plaintiff's standing because to credit the conclusion that the lead-sheathed cables caused contamination in the Town would require the Court to draw multiple unwarranted inferences not adequately supported by factual allegations. "[A] plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing," *Palmieri v. Town of Babylon*, No. 01-CV-1399, 2006 WL 1155162, at *12 (E.D.N.Y. Jan. 6, 2006)), *aff'd*, 277 F. App'x 72 (2d Cir. 2008), and allegations suggesting that injury "is within the realm of conceivable possibility" are insufficient, *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 650 (S.D. Ala. 2005).

Plaintiff's allegations regarding water contamination in Wappinger Falls suffer from similar flaws. While the 2023 Water Report notes that one drinking water sample demonstrated elevated lead levels, the report itself explains that the most likely cause is "[c]orrosion of

household plumbing systems" or "erosion of natural deposits." *See* 2023 Water Report 4. This report thus makes implausible, and certainly without any factual foundation, Plaintiff's allegations that Defendants' cables are the true cause of any lead contamination runoff experienced in the Town. And while Plaintiff attempts to rely on an EPA report noting that certain portions of Wappinger Creek are "impaired for multiple designated uses," (Am. Compl. ¶ 101), the report indicates that the impairment is due to contaminants *other than lead*, *see How's My Waterway?*, EPA, https://mywaterway.epa.gov/community/Wappinger/identified-issues [https://perma.cc/2DN9-LBKK] (last visited Sept. 11, 2026).

Plaintiff also relies on another EPA report which indicates that creek sediments in Wappingers Falls contained lead, but the report attributes this contamination to runoff from "[a]n industrial park that conducted many commercial activities for over 180 years" rather than to lead-sheathed cables. (Am. Compl. ¶ 102 (citing *Superfund Site*, EPA, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.cleanup&id=0201758&utm [https://perma.cc/NY3K-R8PZ] (last visited Sept. 11, 2026).) Although Plaintiff attempts to connect this report to Defendants by alleging "[u]pon information and belief" that "telecommunications infrastructure—including lead sheathed cables—was historically installed in and around" the industrial park, (*id.* ¶ 103), the report itself says nothing about cables or other telecommunications infrastructure, and instead lists commercial activities such as "manufactured gas plants (MGP), textile dyeing, bleachery, and metal plating facility operations," *Superfund Site*, EPA, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.cleanup&id=0201758&utm [https://perma.cc/NY3K-R8PZ] (last visited Sept. 11, 2026). Moreover, the Amended Complaint admits that the Atlas Wellfield (the primary source of drinking water for the Town of Wappinger) is upstream of this industrial park and this would

not be impacted. (Am. Compl. ¶ 104.) Indeed, the report Plaintiff cites in support of the allegation that Atlas Creek is situated along Wappinger Creek, (*id.* ¶ 97 n.22), states that "lead has not been found in the drinking water" in Atlas Wellfield, *see* Town of Wappinger, Drinking Water Source Protection Program (DWSP2) Plan 1.11, at 34 (2023), https://townofwappinger ny.gov/wp-content/uploads/2024/01/DWSP2-Town-of-Wappinger_230126.pdf [https://perma.cc/ZVD8-M8TN].

Finally, while the Amended Complaint alleges that Plaintiff has been injured by "[a]ir [c]ontamination" in addition to soil and water contamination, (Am. Compl. ¶ 172), the only specific allegation as to airborne contamination involves a worker in Minnesota tasked with directly handling lead, (*id.* ¶ 131), and there are no facts suggesting that the public has suffered airborne exposure to lead anywhere, let alone within the Town.

As mentioned above, even assuming that Defendants' actions have injured property in a neighboring town (or elsewhere in the state), this is insufficient to establish that the Town's property has been similarly contaminated without specific allegations rendering such an injury plausible. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 608–10 (S.D.N.Y. 2001) (general allegations about harmfulness of contaminant and widespread presence of contaminant throughout the state did not confer standing where contaminant had not been detected on plaintiffs' properties or plaintiffs had not tested their properties to assess possible contamination); *see also Kell*, 2024 WL 1116651, *4 (article reporting that samples of chocolate bars sold by defendant contained high levels of lead did not provide a factual basis for plaintiff to allege that the bars she purchased contained lead, as "[i]t would be impermissible conjecture to extrapolate[e] those findings" to the products purchased by plaintiff "without some specific factual basis to do so"). Plaintiff has provided no allegations

that would plausibly support the conclusion that such contamination did migrate, or could have migrated, to or otherwise affected the Town. *See Knaust v. City of Kingston*, 193 F. Supp. 2d 536, 543 (N.D.N.Y. 2002) (dismissing for lack of standing where there was nothing to suggest an imminent threat of contamination "other than mere conjecture"); *cf. R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 509, 515 (2d Cir. 2020) (holding that plaintiff, whose property was near facility from which defendant allegedly discharged contaminants, sufficiently alleged physical contamination of his property where he alleged that testing on his property demonstrated measurable levels of contaminant); *Harrington v. Saint-Gobain Performance Plastics Corp.*, No. 18-CV-152, 2018 WL 5668624, at *1 (N.D.N.Y. Nov. 1, 2018) (holding that the plaintiff's allegation that his property was contaminated was plausible in light of supporting facts, including that the property was within an area that state and environmental agencies had classified as a hazardous waste disposal site due to the migration of contaminants from the defendant's facility). The Court cannot plausibly infer from Plaintiff's general allegations about the many dangers of lead and the fact that Defendants maintain lead-sheathed cables elsewhere that Plaintiff has been injured or faces a credible threat of injury. "[F]ederal jurisdiction cannot lie if the alleged injury is merely an ingenious academic exercise in the conceivable." *MTBE*, 175 F. Supp. 2d at 609.[9]

[9] Because Plaintiff has failed to plausibly allege any contamination, it also cannot establish standing by asserting the "need for costly health monitoring," (Am. Compl. ¶ 172), as "a plaintiff cannot manufacture standing merely by inflicting harm on themselves based on fears of hypothetical future harm that is not certainly impending," *Baptiste-Elmine v. Richland & Falkowski, PLLC*, No. 21-CV-4994, 2025 WL 974346, at *6 (E.D.N.Y. Apr. 1, 2025); *see also Jantzer v. Elizabethtown Cmty. Hosp.*, No. 19-CV-791, 2020 WL 2404764, at *5 (N.D.N.Y. May 12, 2020) ("[The] plaintiffs are not permitted to use unspecified monitoring to manufacture an injury because mitigation expenses do not qualify as actual injuries where the harm is not imminent."); *Rudolph v. Hudson's Bay Co.*, No. 18-CV-8472, 2019 WL 2023713, at *3 (S.D.N.Y. May 7, 2019) (explaining that while "[a]n injury may include mitigation-related

In its opposition, Plaintiff submitted a declaration from a "licensed geologist and certified hydrogeologist," who certified that he traveled on roads throughout the Town in order to "identif[y] aerial cables within the Town displaying the visual characteristics of lead telecom cables" and "conduct[] limited soil sampling in several areas in proximity to" these cables. (*See* Perez Decl. ¶¶ 2, 8, 11.) The declaration avers that "[l]aboratory analysis revealed elevated lead levels above typical background concentrations for rural areas in the State of New York." (*Id.* ¶ 11.) According to Plaintiff, "[t]his declaration further supports the Town's allegation that, on information and belief, there are lead-containing cables within its geographical area." (Pl.'s Omnibus Opp'n 10.)

The first issue with this argument is that the Perez Declaration was not submitted to "controvert [evidence] presented by the [D]efendant[s]," *Kouyate*, 2025 WL 722874, at *1, but rather to "shore up a deficient complaint through extrinsic documents submitted in opposition to [Defendants'] [M]otion to [D]ismiss," *Van Denburgh v. New York*, No. 24-CV-989, 2025 WL 2483415, at *9 (N.D.N.Y. Aug. 28, 2025). Thus, the Court need not consider this declaration, particularly given that Plaintiff already had the opportunity to amend its complaint in response to Defendants' argument, in its pre-motion letter, that it cannot show any harm within its borders. (*See* Am. Compl.; *see also* Letter from Jennifer Del Medico, Esq. to Judge Seibel (Mar. 7, 2025)

---

expenses based on a substantial risk that the harm will occur . . . [a] plaintiff does not demonstrate a substantial risk of harm by alleging an attenuated chain of inferences that might result in injury"); *Riva v. Pepsico, Inc.*, 82 F. Supp. 3d 1045, 1053 (N.D. Cal. 2015) (holding that the plaintiffs lacked standing to bring medical monitoring claim where inferences of increased risk of harm were speculative). This is particularly true here, as there are no allegations that any Town funds have actually been spent on medical monitoring or similar mitigating measures. *Cf. Tiger v. Verizon Commc'ns Inc.*, No. 23-CV-1618, 2025 WL 437019, at *6 (W.D. Pa. Feb. 7, 2025) ("While the injury in a medical monitoring claim is the cost of the medical care that will, one hopes, detect that injury, a present need to obtain medical testing doesn't transform into a present economic injury sufficient to confer standing. Because [the plaintiff] did not go to the doctor or incur any medical expenses, there can be no economic injury.").

2 (Dkt. No. 158) (Defendants' pre-motion letter pointing out that the Town "has not sufficiently alleged any harm to its property").) *See Harty v. W. Point Realty, Inc.*, 477 F. Supp. 3d 163, 169 (S.D.N.Y. 2020) (declining to consider affidavit submitted in support of plaintiff's opposition where defendants' motion was "based solely on the allegations of the complaint," as "counseled plaintiffs may not use their opposition to a motion to dismiss to raise new claims or arguments" and "plaintiff had an opportunity to amend his complaint to address the purported deficiencies made apparent by the fully briefed arguments in defendant's motion but elected not to do so"), *aff'd*, 28 F.4th 435 (2d Cir. 2022).

But even if the Court were to consider this declaration, it is insufficient to plausibly establish that Plaintiff has suffered an injury. The declaration merely states that the soil tested "in proximity to" the suspected lead-based cables had elevated lead levels in comparison to "rural areas in the State of New York" and exceeded the background lead levels "for undeveloped areas in New York." (Perez Decl. ¶ 11.) But the samples do not appear to have been collected from "rural" or "undeveloped" areas—they appear to have been collected along roadways through the Town and/or in "residential" areas. (*Id.* ¶¶ 7–8.) This is a salient distinction, as the BTSA report specifically notes that roadways are "a common source of lead" and soil along roadways is expected to contain higher lead levels. BTSA Report at 7. The Court cannot infer from the fact that the soil exceeded background levels for "undeveloped" areas that any Town property has been contaminated, as there is nothing in the declaration suggesting that the lead levels were at all higher than the background concentrations that would be relevant for the areas tested. *See LaBauve*, 231 F.R.D. at 646–47 (holding that the plaintiff could not establish injury-in-fact based on allegations of contamination from the defendants' facility where levels of contaminant fell below background concentration).

Accordingly, because Plaintiff's purported injuries are speculative and unsupported by factual allegations, the Amended Complaint must be dismissed for lack of standing. *See Diederich v. County of Rockland*, 999 F. Supp. 568, 573 (S.D.N.Y. 1998) (dismissing for lack of standing where plaintiff "offer[ed] only speculative statements, based 'upon information and belief' and ma[de] no concrete showing of any injury, much less an injury connected to the defendants' actions"), *aff'd*, 166 F.3d 1200 (2d Cir. 1998); *Arcure v. Kellogg Co.*, No. 10-CV-192, 2011 WL 13294631, at *4 (M.D. Fla. Mar. 29, 2011) (dismissing for lack of standing where the plaintiff's allegations of potential contamination were "at best conjecture").

Because the Court concludes that Plaintiff lacks standing, it has no authority to reach, and will not reach, the merits of Defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim. *See Hollingsworth v. Perry,* 570 U.S. 693, 700-01 (2013) ("Because we find that petitioners do not have standing, we have no authority to decide this case on the merits and neither did the Ninth Circuit.").

III. Conclusion

For the foregoing reasons, Defendants' motions to dismiss are granted. Because Plaintiff failed to adequately establish standing and the Court thus lacks subject matter jurisdiction, the dismissal is without prejudice. *See Martin v. Bottom Line Concepts, LLC*, 723 F. Supp. 3d 270, 280 (S.D.N.Y. 2024) ("[A] dismissal for lack of standing is, by definition, without prejudice."). The Clerk of Court is respectfully directed to terminate the pending motions, at Dkt. No. 175 and Dkt. 178.

SO ORDERED.

Dated: September 30, 2026
White Plains, New York

KENNETH M. KARAS
United States District Judge.